SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CRIMINAL DIVISION
Felony Trial Branch

A TRUE COPY
TEST: 9-16-05

Clerk, Superior Court of the
District of Columbia
By: _____
Deputy Clerk

UNITED STATES

      v.

JASPER DOCKERY,
               Defendant

    :
    :
    :
    :
    :
    :

Criminal No. F-536-96
Judge Abrecht

## MEMORANDUM OPINION AND ORDER DENYING § 23-110 MOTION

This matter is before the Court on Defendant Dockery's first Motion Pursuant to D.C. Code § 23-110 in Violation of Ineffective Assistance of Counsel [in F-536-96] and Newly Discovered Evidence for New Trial or Dismissal filed on April 10, 2001. The Government's Opposition was filed on July 31, 2001. Defendant requested 90 days to file a response to the government's opposition and the Court requested an affidavit from trial counsel. On October 26, 2001, the Government filed a Supplement to its Opposition with a five-page Affidavit of Richard Gilbert. On December 12, 2001, Defendant filed a forty-seven-page "Response in Opposition to Government's Response" with over fifty pages of exhibits. Also on December 12, 2001, Defendant filed a ten-page "Supplement to Defendant's Opposition to Government's Supplement and Mr. Gilbert's Affidavit." In reality, the "Response" and "Supplement" was a second § 23-110 motion. Based on the findings of facts and conclusions of law that follow, the Court will deny Defendant's requests for a new trial or dismissal.

### Factual Background

Defendant was found guilty by a jury of ten counts -- Premeditated First Degree Murder While Armed of James Ivy, six counts of Assault (on Willie Ashmon, James Conyers, Kinikki

Brown, Shavaughn Royal, Yasmin Chambers and Everett Newman) with Intent to Kill Willie Ashmon While Armed, Possession of Firearms (pistols and a shotgun) During a Crime of Violence, and Possession of Ammunition. The Government presented overwhelming evidence from eyewitnesses and corroborating physical evidence that Defendant Dockery was the mastermind behind, and an active aider and abettor in, each of the charged offenses, which occurred on July 27, 1995. Although Defendant did not personally fire a gun on July 27, Harry L. Williams, who did, testified that the Defendant gave him and three others the order to shoot Willie Ashmon and supplied the firearms, the ammunition, and the van used by the four shooters. There were also eyewitnesses to the planning conversations and to Defendant's presence in the vicinity during the shooting. After the shooting, Defendant congratulated the shooters on a job well done. Defendant's bag (with clothing of Dockery's children), Defendant's shotgun and ammunition were found at the scene. The Government also presented evidence that prior to July 27, Defendant had developed a motive for shooting at Willie Ashmon and others who sold drugs on E Street, Northeast, because they were cutting in to his own drug selling business in the area and were shooting at him and his associates. Finally, the Government presented evidence of Defendant's consciousness of guilt in that after the shooting he hid in New York and tried to arrange for friends and associates to give false statements to distance him from the crimes.

Defense witnesses, including the Defendant himself, corroborated some aspects of the Government's case, while denying Defendant's participation in planning the shootings.

Defense counsel argued vigorously (but largely unsuccessfully) for exclusion of other crimes evidence and suppression of statements and tangible evidence obtained in New York and

during searches of Defendant's Maryland home. Counsel tried to preserve such arguments for appeal. Against Counsel's advice (as revealed in an *ex parte* bench conference on August 26, 1998, *see* Tr. 1214-1216), Defendant Dockery voluntarily chose to testify about and deny the crimes for which he had been convicted in F-153-96. Defense counsel also argued that the admitted gunman H.L. Williams acted for his own reasons and not on direction from Dockery.

Immediately after the jury announced its guilty verdicts, Mr. Dockery asked for a new trial and new counsel (8-31-98 Tr. 7-8). With new counsel, Defendant was sentenced on October 30, 1998, to life without parole on the first-degree murder count pursuant to D.C. Code § 22-2404.1(b)(2) and (11) and to not less than sixteen nor more than forty-five years of imprisonment on the other nine counts. In light of the holding in *William Keels v. United States,* A.2d    (No. 98-CF-860, D.C. November 21, 2001) and the fact that the aggravating factors (D.C. Code § 22-2404.1(b)(2) and (11)), which caused this Court to impose life without parole, had not been the subject of a special verdict form, this Court will reduce Defendant's sentence for first-degree murder to thirty years to life imprisonment when the record is remanded from the Court of Appeals.

Issues Raised in First § 23-110 Motion

Defendant's allegations against counsel invoke the standard set in *Strickland v. Washington,* 466 U.S. 668 (1984), and fail for lack of factual support.

### I. Alleged Ineffective Assistance of Counsel in New York.

Defendant's contention that he was prejudiced by ineffective assistance of counsel at his removal hearing in New York has no merit. The removal hearing on February 7, 1996 was based on a Superior Court bench warrant issued January 5, 1996, following indictment of

3

Defendant that same day for First-Degree Murder in F-153-96 **and** a Superior Court bench warrant issued January 23, 1996, following indictment that day for another First-Degree Murder in F-536-96. Agent Nathan Tucker submitted an affidavit concerning the January 23rd indictment and bench warrant. Magistrate Judge Levy summarized for Defendant on the record the charges in the January 5th indictment (p. 4 of 2-7-96 Tr., Ap. C to Govt. Op.). Defendant concedes that he waived his right to contest removal on advice of counsel. He faults counsel for not advising him that the indictment was unauthorized and that Agent Tucker's affidavit was false.

Concerning the indictments, Defendant argues that the indictments were unauthorized because the copies shown to him had not been signed by the forepersons of the grand juries. Even if counsel in New York had been ineffective in failing to notice and challenge the indictment for lack of a signature, Defendant was not prejudiced. Had inquiry been made, a facsimile transmission of the filed original bearing the foreperson's signature could have been produced. Fed. R. Crim. Proc. 40 (a). Indeed, when Defendant raised this issue before trial, the signed originals were shown to him (probably on July 22, 1998). The Court has attached to this Memorandum Opinion both indictments, showing the file dates on the first page and the forepersons' signatures on the last page. *See* Appendix A (listed as GJO and filed in F-153-96) and Appendix B (F-536-96). There can be no question that the bench warrants for Defendant's arrest were based on authorized indictments.

His claim in his first Motion about alleged falsehoods in Agent Tucker's affidavit is vague. In addition to challenging Agent Tucker's reliance on the unsigned indictments, Defendant contends that law enforcement officials knew that they lacked probable cause to arrest

4

him for murder. Because Defendant does not specify the alleged falsehood in Agent Tucker's affidavit, the Government was unable to respond and this Court has no basis on which to grant Defendant a hearing. In his Response, Defendant suggests that the "falsehood" may have been in Tucker's reference to the United States District Court as the issuing court, when in fact the warrants had been issued by the Superior Court (Response pages 8-10, 34). Defendant suffered no prejudice from counsel's failure to catch a misstatement as to which court issued a warrant. The fact remains that two Superior Court bench warrants based on two Superior Court indictments (dated January 5 and January 23, 1996, respectively) were outstanding at the time of Defendant's removal hearing on February 7, 1996.

## II. Alleged Ineffective Assistance of Counsel in D.C.

### A. Failure to challenge October 23, 1995, search at Pitkin Avenue in Brooklyn, NY

Defendant contends that attorney Richard Gilbert rendered ineffective assistance of counsel by failing to challenge the legality of the law enforcement entry and search of his home and grocery store at 2127 Pitkin Avenue in Brooklyn, NY on October 23, 1995. He alleges that a successful challenge to that search would have resulted in suppression of all evidence seized. He fails, however, to specify what evidence seized on October 23 was used against him in the trial he now seeks to have overturned and this Court knows of none. The law enforcement agents did not find Defendant Dockery when they entered his home in October. Defendant does not state what, if any, physical evidence was seized from his home or store but, in any event, the trial record makes clear and the government's Opposition declares that no physical evidence was admitted at trial in connection with the October 23, 1995 search at Pitkin Avenue. Thus, there

was no ineffectiveness in trial counsel's failure to file a motion to suppress unspecified evidence seized from Pitkin Avenue in October. *McKinnon v. United States*, 644 A.2d 438, 444 (D.C. 1994) (no ineffectiveness for counsel in mayhem case to concede permanent injury element in order to focus on alibi defense).

The only arguable "evidence" used at trial from the entry into Defendant's property in Brooklyn in October 1995 was Agent Tucker's testimony on July 30, 1998, about observing the reinforced door and pit bull and not finding Mr. Dockery inside despite having observed him from the outside at a second floor window. In his Response, Defendant states that counsel was ineffective in failing to move to suppress Tucker's description of the search. However, Defendant's trial counsel and Defendant himself did make timely objections to this testimony (7-30-98 Tr. 703-705). The Government proffered reliable information about outstanding warrants for Defendant's arrest in October 1995, thereby making the entry and search of his premises lawful. Although trial counsel's argument for exclusion of the testimony was unsuccessful, counsel preserved Defendant's appellate right on this issue and was not ineffective. Defendant argues that counsel should have raised the issue earlier in a pretrial suppression motion but proffers no reason for the Court to have found the October search unlawful, given the existence at the time of a valid felony arrest warrant for obstruction of justice (a charge that was later subsumed within the indictment in F-153-96). Contrary to Defendant's claim (Response at 26), the warrant is not presumed to be unlawful unless the government can produce an NCIC printout and original complaint and warrant affidavit more than six years after it was withdrawn. The burden in a § 23-110 motion is on the Defendant to show prejudice.

**B.** *Alleged failure to challenge February 6, 1996 search and arrest at Pitkin Avenue in Brooklyn.*

Defendant faults trial counsel Richard Gilbert for failing to challenge his arrest and the search of his home on the basis that there was no valid arrest or search warrant. This claim has several aspects, which will be addressed in turn.

First, Defendant's challenge to the arrest and search in New York was in fact raised repeatedly before the trial court. Defendant raised the issue *pro se* and at his first trial in F-153-96. Trial counsel in this case facilitated him by, for example, filing on January 9, 1998, a Notice of Intent to Adopt Previously filed Motion to Dismiss and on June 10, 1998, a Notice of Defendant's *Pro Se* Motion to Supplement Previously Filed Motion to Suppress Statements. Both of these motions included Defendant's current argument that there was no warrant and that Agent Tucker lied in saying there was. The trial court heard both counsel and Defendant himself on these issues and denied the relief requested after concluding based on the evidence and the law that his claims had no merit. Assuming for the sake of argument that it would have been ineffective of counsel not to raise these issues, Mr. Gilbert was not ineffective because counsel did *not* fail to raise these issues.

Second, Defendant's assertion -- that Richard Gilbert determined based on his investigation in Brooklyn that "there was never any arrest warrant submitted there in that U.S. District Court House for Mr. Dockery's arrest as stated in FBI Tucker's affidavit on February 7, 1996"-- is not supported by affidavit from Mr. Gilbert and is contradicted by the documentary evidence. If not intentionally misrepresenting the facts, Defendant may mean that the file did not contain a detailed affidavit establishing through witness statements probable cause to believe

7

that he committed a murder and any document bearing the words "Arrest Warrant." The New York file did not contain such an affidavit or the type of arrest warrant that would issue based on such an affidavit. Instead, the file contained a document titled "Bench Warrant" signed by a judge based on an indictment. That document commanded the arrest of Jasper Dockery of 2127 Pitkin Avenue, Brooklyn, NY, for First-Degree Premeditated Murder While Armed. *See* Appendix C.

Third, Defendant's statement that *no* warrant supported his arrest is erroneous, negated by documentary evidence of which he has been aware for years. At least two warrants supported his arrest. By the time of his arrest on February 6, 1996, Chief Judge Eugene Hamilton of the Superior Court had issued a bench warrant on January 5, 1996, following indictment of Defendant that same day for First-Degree Murder in F-153-96 (the Jones murder and obstruction of justice) **and** Judge Jose Lopez of the Superior Court had issued a bench warrant on January 23, 1996, following indictment that day for another First-Degree Murder in F-536-96 (the Ivey murder). FBI Agent Nathan Tucker submitted an affidavit to the New York court on February 7 concerning the January 23rd indictment and bench warrant and attached the January 5th bench warrant and indictment. The existence of these two bench warrants and indictments is confirmed by review of Superior Court files (F-153-96 and F-536-96). Agent Tucker did not need to have a copy of a warrant in his possession at the time of arrest. D.C. Code § 23-562 (a) (1) (2001).

Record proof that, contrary to Defendant's claim, a copy of an arrest warrant was also submitted to the United States District Court in Brooklyn, New York, comes in two forms--the transcript of the removal hearing and copies of the Brooklyn file. Magistrate Judge Levy reviewed the adequacy of the file and summarized for Defendant on the record the charges in the

8

January 5th indictment (p. 4 of 2-7-96 Tr., Ap. C to Govt. Op.). Thereafter, on February 20,

1996, the United States District Court for the Eastern District of New York sent to the United

States District Court for the District of Columbia a copy of its entire file concerning Mr.

Dockery's proceeding. In January 1998, the Government obtained a certified copy of the file

from New York. The Government attached the February 20, 1996 cover letter to the District of

Columbia and all seventeen pages of the file as Attachment B to its February 10, 1998

Government's Supplemental Memorandum in Opposition to Defendant Dockery's Motion to

Suppress Statements in this case. The file included the arrest warrant signed January 5, 1996 by

Chief Judge Hamilton and the indictment that Judge Levy summarized during the removal

hearing.

Further evidence that a copy of the warrant and affidavit had indeed been submitted on

February 7, 1996, is the date, time, and number line automatically generated by the facsimile

machine at the very top of the pages. Both the warrant and indictment indicate that they were

sent by facsimile on 02/07/96 shortly after 1:00 p.m. (1300 in military time). *See* Appendix C to

this Memorandum. A document entitled "Pedigree Sheet" indicates that Dockery's hearing was

held at 4:45 p.m. [These documents were also filed in March 1996 in F-153-96.]

Defendant has misrepresented the facts on this warrant issue before. In his *Pro se*

Motion submitted on his behalf by counsel on June 10, 1998, four months after receiving the

seventeen-page New York record from the government, Defendant Dockery alleged that the

entire New York file had only fifteen pages. He attached to his motion fifteen of the seventeen

pages he had received from with the government's Opposition and included the letter bearing the

government's "Attachment B" designation at the bottom. He omitted from his attachment the

Commitment form and, most significantly, the bench warrant. He then argued that his statements should be suppressed because there was no warrant to support his arrest!

On July 15 and 22, 1998, this Court heard orally Defendant's concerns about an alleged warrant-less arrest on February 6 and denied relief (7-22-98 Tr. 196-198). Counsel preserved that issue for appellate review in writing, at those hearings and again during trial on July 30 and August 24, 1998. There is no need for yet another hearing on his current claim that trial counsel was ineffective in dealing with the warrant issue because the entire record, especially the existence of two bench warrants, firmly establish that he is entitled to no relief. In the face of clear evidence of indictments and warrants authorizing his arrest, his continued insistence that there was no warrant and that law enforcement officers lied is disingenuous.

### C. Counsel's alleged failure to present *Winfield* evidence that others had a powerful motive for revenge, such that the jury might have a reasonable doubt that Defendant orchestrated the shooting at Ashmon (which resulted in the Ivey murder).

Dockery faults his trial counsel for failing to introduce certain evidence that he claims would show that H.L. Williams and the others who fired shots that killed Ivey acted for their own motives with help from Tonya Abrams and Nicole Bullock. He relies on *Winfield v. United States*, 676 A.2d 1 (D.C. 1996), in which the Court of Appeals established that a defendant has a right to admit evidence that a third person committed the crime with which he is charged if he has evidence of facts and circumstances which tend to indicate some reasonable possibility that such other person (who was unrelated to the defendant) committed the charged offense. Thus, under *Winfield,* the fact that a third person with no connection to the defendant had a motive to commit the crime with which the defendant is charged may be admissible.

10

The *Winfield* principle does not apply to the facts of this case. This is a case in which there is no dispute about who did the shooting. Unlike *Winfield*, both the government and the defendant in this case agree that the defendant did not do the shooting; both agree that H.L. Williams and others fired the shots. Unlike *Winfield*, both the government and the defendant in this case agree that the defendant was closely related to each of the third parties on which the defendant seeks to shift the blame. The dispute in this case is over whether Defendant Mr. Dockery aided and abetted the crime or whether H.L. Williams acted without Dockery's encouragement.

Defendant's vague contention -- that Williams had reasons for wanting to shoot Ashmon and that Tonya Abrams and Nicole Bullock helped him -- even if true, does not make it any less likely that Dockery urged him to do the shooting and paid him for doing so. The Government's evidence established that there were ongoing disputes between Dockery's drug operation and the rival E Street Crew. H.L. Williams, Nicole Bullock, Corey Bullock and Tonya Abrams were all associated with Dockery's side of the dispute. Willie "Reds" Ashmon (the target of the July shooting) was a member of and enforcer for the E Street Crew. Each of Dockery's specific contentions about evidence that should have been introduced by trial counsel will be addressed in turn. None warrant a new trial or even an evidentiary hearing on the current record. The possibility of other motives was presented to the jury and simply did not indicate a reasonable possibility that H.L. Williams acted without directions and help from Dockery.

**Testimony of daughters.** Dockery's first complaint is that trial counsel failed to follow his request to interview and call his young daughters Creola and Gennette Dunning. He claims that they could corroborate his claim that Nicole Bullock and Tanya Abrams were behind the

11

shooting because the children allegedly saw the women remove the shotgun from the Southern Avenue apartment. On this point, in his first Motion, Defendant made only a vague unsworn proffer that he "requested to his counsel to interview and call" these witnesses. In contrast, the government submitted an affidavit from trial counsel specifying that it was his "practice to write down things Mr. Dockery wanted investigated, and ... to write down potential contact information" (Affidavit at p. 3 n. 4). Counsel swore that he had "no record that Mr. Dockery ever mentioned that ... his children...had any information ... and no record that Mr. Dockery ever asked [him] to call them as witnesses" (Affidavit at p. 3). In his Response, Defendant repeats his vague allegation in affidavit form but still does not state when or how he made the request of counsel.

On this record, given the vagueness and lateness of Defendant's claim (first made three years after trial), the specificity of counsel's affidavit, Defendant's prior conviction in F-153-96 for obstruction of justice and Defendant's record of making timely complaints to the court, the Court can reject Defendant's ineffectiveness claim without a hearing. Throughout the pretrial and trial proceedings, Defendant frequently spoke directly to the Court, especially when counsel or investigators were not doing what he wanted. Thus, it is inconceivable that Mr. Dockery would not have complained to the Court about the absence of his children before he rested his defense if he had in fact asked counsel to call his children as witnesses. Mr. Dockery and his counsel spoke with each other in private and both spoke to the Court before the defense case began about disagreements over the form the defense should take, without any mention of the children (8-25-98 Tr. 1023, 1010; 8-26-98 Tr. 1215-1216). Many other witnesses and the difficulties in securing their presence were discussed in Dockery's presence as the defense case

12

proceeded (8-25-98 Tr. 1117, 1120, 1203; 8-27-98 Tr. 1469, 1473-1478). Counsel took pains to explain on the record why he did not wish to call Ms. Terri Howard as a witness, for example, despite Mr. Dockery's request; and Mr. Dockery spoke directly to the Court explaining why he wanted Ms. Howard's testimony (8-27-98 Tr. at 1473-1478). Neither counsel nor Mr. Dockery ever discussed the children's testimony with the Court and Mr. Dockery never complained about their absence, while complaining about the absence of others. Therefore, the Court does not believe that at the time of trial, Mr. Dockery wanted his children as witnesses.

However, even if he did want his children as witnesses, Defendant would still have to show prejudice before relief could be granted. Defendant has failed in several respects to show prejudice. He has not submitted affidavits from his children supporting his claim of what their testimony might have been. He thus offers no support for his claim that they would have been able to testify in the summer of 1998 about observing Nicole Bullock and Tonya Abrams remove a shotgun from 4165 Southern Avenue three years earlier in June of 1995. *Ready v. United States*, 620 A.2d 233, 235 (D.C. 1993) (in collateral attack on conviction, a defendant claiming to have exculpatory witnesses is required to submit affidavits of those witnesses). He has not even submitted an affidavit of his own concerning their ages, how he knows what they saw, or when and how he learned of their knowledge. In any event, even if his claim about their potential testimony were accepted as true, Defendant would be entitled to no relief because the children's seeing movement of a shotgun by Nicole Bullock or Tonya Abrams in June 1995 would not raise a reasonable doubt about Defendant's ordering a shooting on July 27, 1995. *Spencer v. United States*, 748 A.2d 940 (D.C. 2000) (record revealed no prejudice from failure to

13

call witness)[1].

**Other shootouts with Ashmon.** Defendant faults defense counsel for not adequately bringing evidence of third party motive. Defendant claims that both Nicole Bullock and H.L. Williams had independent motives for wanting Ashmon killed and that Williams did the shooting both because Ashmon had provoked him and because Nicole Bullock asked him to. H.L. Williams testified as a government witness that Dockery asked him to kill Ashmon and that Dockery supplied the guns and a van (8-24-98 Tr. 935-942, 962).

Since the identity of Williams as a shooter in the Ivey murder was not in dispute, the admissibility of the prior shootings is questionable and could distract the jurors. Nevertheless, Defendant argues that the jury would have a reasonable doubt about his involvement in the instant shooting, if they heard about prior shootings without hearing evidence of his involvement in prior shootings. Defendant's logic is flawed.

In any event, Defendant shows neither ineffectiveness nor prejudice from counsel's handling of the matter of prior shootings.

Defendant faults trial counsel for allegedly not using, during cross-examination of Ashmon, Ashmon's out-of-court statements (witness statement to Detective Reed and grand jury testimony) about prior shootouts (Defendant's Motion at 24-25; Supplement to Defendant's Opposition at 9). Defendant's recollection of the cross-examination is mistaken. Counsel did in

---

[1]. Defendant proffers no witness to support his claim (Motion at 23) that "Tonya and Nickole gave the white van and shot-gun to HL Williams, and others to take revenge against the E Street crew" on July 27, 1995.

14

fact use those statements to "elicit on cross-examination of Ashmon that he had been shot at before by Williams and also had a shootout with Nicole Bullock" (Gilbert Affidavit at p. 4, paragraph 6, 7-24-98 Tr. 155-156)). Counsel also elicited the fact that they teased Williams before the shooting (7-24-98 Tr. 156). Moreover, a stipulation was admitted in evidence (when Ashmon did not appear to testify as a defense witness) advising the jury that Ashmon told Detective Reed that he had been with others who were making fun of H.L. Williams. That stipulation and the cross-examination provided the basis for argument that Williams had a motive to shoot at Ashmon.

Defendant is not clear about what greater use was to be made of the out-of-court statements without risking damaging testimony. Although Defendant contends that the prior shootings showed that Nicole Bullock and H.L. Williams could act independently of Dockery, Ashmon would likely have opined that they were acting at Dockery's direction. In the grand jury testimony of Willie Ashmon about the shootout with Nicole Bullock, Ashmon explains that he considered Bullock's acts part of Dockery's effort to kill him. Ashmon thought Dockery was sending his people looking for him (see Defendant's Ex. 8). Williams and Bullock were known to the E Street crew as Dockery's people. On direct examination, Ashmon testified that he and others with whom he sold drugs on E Street had "had a little run in" with Dockery, who wanted Ashmon and his associates "away from there so he could do his little thing around there" (7-24-98 Tr. 120-122). He would see Dockery with H.L. Williams and Corey Bullock (7-24-98 Tr. 121). On cross-examination, Mr. Gilbert asked about the "run in" and learned that "it was through him [Dockery] but it wasn't with him. It was his little crew or whatever. That's why I say it was him because nine times out of ten he [Dockery] sent them around there" (7-24-98 Tr.

15

155). Thus, closer questioning of Ashmon in an effort to establish that Nicole Bullock or H.L. Williams acted independently of Dockery might have backfired. At a bench conference, counsel recognized the dilemma and made a tactical decision to ask questions but to proceed cautiously (7-24-98 Tr. 154-155). *Doe v. United States*, 583 A.2d 670, 673 (D.C. 1990) (no hearing required on ineffective assistance claim where counsel's decision not to pursue a certain defense was tactical decision and defendant failed to show he would have prevailed if defense had been pursued).

Dockery's trial counsel also followed Dockery's instructions to try to have Billy Jones testify about Williams' prior efforts to shoot Ashmon, but was restricted by the Court. Counsel preserved that issue for appeal (*see* 8-27-98 Tr. 1469). Defendant acknowledges that Jones' testimony would have been no substitute for Ashmon's testimony in any event (Supplement to Defendant's Opposition at 6).

Even if counsel had been more effective in presenting evidence suggesting that H.L. Williams or Nicole Bullock had been sufficiently provoked by Willie Ashmon to want him killed, that evidence would not have made it any less likely that Dockery also wanted Ashmon killed and used Williams to try to accomplish the task. All of the people whom Dockery claims had motives to shoot at Ashmon or other members of the E Street crew are closely linked with Dockery. H.L. Williams worked for Dockery. Corey Bullock worked for Dockery. Tony Abrams was Corey Bullock's girlfriend. Nicole Bullock was Corey Bullock's stepsister and the mother of one of Dockery's children. Thus, even if all the alleged motive evidence was admitted and argued it would at best establish that Williams had multiple motives for shooting at Willie Ashmon.

16

Defendant Dockery has not met his heavy burden of showing that Mr. Gilbert was ineffective in his tactical choices about how to pursue the motives of others. The Supreme Court and our Court of Appeals demand that trial counsel be given sufficient latitude to make tactical judgments, which involve the exercise of professional abilities. *Woodward v. United States*, 738 A.2d 254, 257 (D.C. 1999), citing *Strickland v. Washington, supra*, 466 U.S. at 689. Moreover, Defendant Dockery has not met his heavy burden of showing that counsel failed to introduce admissible evidence that would probably have lead to a different result at trial.

In any event, the weak circumstantial evidence that H. L. Williams was motivated to shoot at Ashmon because Ashmon had made fun of him or because Nicole Bullock wanted to retaliate for past wrongs does not cast a reasonable doubt on the Government's evidence that H. L. Williams and others willingly participated in a shooting requested by Dockery. The Government's evidence of Defendant's involvement in and responsibility for ordering the shooting was direct and overwhelming.

## III. Newly Discovered Evidence

Defendant Dockery also seeks to have a new trial or to have the case dismissed because he claims to have new evidence that FBI Agent Nathan Tucker and MPDC Detective Pamela Reed committed perjury concerning the search for Mr. Dockery at 2127 Pitkin Avenue in Brooklyn, NY. After this conviction in F-536-96, he alleges that he received information in discovery in a pending civil suit that contradicts testimony given by these law enforcement officers in his trial of the Jones murder in F-153-96 in January 1997.

These alleged contradictions are not evidence that these officers lied about any

17

matter during the trial of the Ivey murder. In addition to not meeting the legal standards for the granting of a new trial (as argued by the government at pages 23-25 of its Opposition), Defendant's charge of perjury is simply unsupported.

Defendant may have confused the particulars supporting the search of Pitkin Avenue in October 1995 with the particulars supporting the entry in January 1996. In any event, his claim to newly discovered evidence of perjury is without merit. What Defendant calls contradictions and indications of perjury are neither.

Defendant claims that failure to produce copies of documents in 2001 means that officers lied about the documents' existence in 1996. He is wrong. On January 23, 1997, Agent Nathan Tucker testified that in February 1996 he had warrants for Dockery's arrest (Defendant's Ex. N and Government's Appendix N: Tr. 1-23-97, p. 238, line 12). He explained that a copy had been "faxed up" (Defendant's Ex. N and Government's Appendix N: Tr. 1-23-97, p. 240, line 22). In response to his discovery request in Jasper L. Dockery v. Nathan Tucker, *et al.*, Civil Action No. 97-CV-3584 (ARR)(RLM), in the United States District Court for the Eastern District of New York, Defendant was informed that MPDC had been unable to locate the documents transmitted by facsimile from MPD to the FBI in New York or to identify the person having transmitted them. It is not significant that Detective Pamela Reed, who was already in New York on February 6, 1996, could not in 2001 locate within MPDC any documents allegedly faxed to New York in 1996 before her arrival.

Agent Tucker's testimony about receiving a facsimile of the warrant is nevertheless corroborated by his testimony in New York on February 7, 1996, and by the copy of a bench warrant in the New York file bearing the date "02/07/96" on a line automatically generated by

the sending facsimile machine at the very top of the pages. On the same line appears the District of Columbia telephone number (area code 202) for the sending facsimile machine and the words "Narcotics Unit." *See* Appendix C (Xerox copy of the top line).

That the Metropolitan Police Department did not produce in civil discovery in 2001 an NCIC computer printout of warrants entered into NCIC in 1995 and 1996 does not, as Defendant claims, indicate that Detective Reed lied when she testified that she knew that the warrants had been entered into NCIC. Moreover, since copies of the warrants themselves have been produced, the NCIC record is irrelevant.

Similarly, comparing the civil discovery responses with Detective Pamela Reed's testimony in F-153-96 reveals no contradiction or indication of perjury. The discovery response reveals the Obstruction of Justice warrant issued by Superior Court in August 1995 authorizing the arrest of Jasper Dockery when the FBI searched 2127 Pitkin Avenue for him unsuccessfully in October 1995. That arrest warrant was never "executed" because Dockery was not found before that arrest warrant was withdrawn when an indictment was returned on the same charge. Detective Reed's testimony confirms her knowledge of that warrant and explains that by the time of her trip to New York in February 1996, there were two bench warrants stemming from two indictments. One indictment, filed on January 5, 1996, in F-153-96, concerned the Jones murder and obstruction of justice. The other indictment, filed on January 23, 1996, in F-536-96, concerned the Ivey murder. Detective Reed also mentioned a parental kidnapping warrant. Defendant Dockery does not specify what aspect of her testimony is contradicted by her discovery response and this Court fails to see any contradiction, much less, any indication of perjury.

19

Defendant Dockery's vague proffers contain no evidence (newly discovered or old) to support his slanderous claim that law enforcement officials perjured themselves in testifying that outstanding warrants authorized them to arrest him. *Prophet v. United States*, 707 A.2d 775, 779 (D.C. 1998) (stating no hearing required where court concludes that allegations would not entitle defendant to new trial). Superior Court records corroborate their testimony about the existence of an obstruction of justice arrest warrant before the October 1995 search and the existence of two bench warrants for murder indictments before the February 1996 search and arrest. No confusion or absence of record keeping over faxes or NCIC printouts or errors on printed forms erases the fact that law enforcement officials had been commanded by the Superior Court to arrest Dockery. "The officer need not have the warrant in his possession at the time of arrest...." D.C. Code § 23-562 (a) (1) (2001). Moreover, given the seriousness of the offenses, officers were authorized to arrest him in Brooklyn or anywhere else in the United States where he could be found. D.C. Code § 23-563 (a) (2001). While recognizing that some other police detectives have been known to lie (as evidenced by the Johnny St. Valentine Brown case and other notorious examples submitted by the Defendant), this Court finds no evidence of perjury tainting Dockery's convictions in this case.

### New Issues Raised in Second § 23-110 Motion

Without any explanation or justification for his not having raised all his complaints about trial counsel in his first § 23-110 Motion filed in April 2001, Defendant raises numerous new complaints with his December 2001 filing. Although this Court is not required to rule on

repeated motions under § 23-110[2], a brief review of the new claims reveals that they have no merit and should be denied without a hearing if considered on the merits.

In Defendant's second motion and declaration, he lists several additional witnesses he faults counsel for not calling. The Court will not burden trial counsel with having to submit another affidavit to respond to each of these allegations because these matters can be resolved on the existing record.

**Dr. Frederick Whitehurst.** Defendant complains that Dr. Whitehurst was not called to oppose the testimony of the government's expert Mr. Peters. Defendant is confused. As a result of trial counsel's thorough investigation and presentation at a pretrial hearing (7-21-98 Tr. 166), the government did not call Mr. Peters to testify at trial. Thus, there was no need for Dr. Whitehurst to respond.

**Ms. Terri Howard.** Defendant faults counsel for not calling Ms. Howard. The record reveals that Ms. Howard was not excused by counsel but failed to return to court to be available for testimony. In any event, counsel made a record of his opinion that Ms. Howard's testimony would have been more prejudicial than exculpatory (see 8-27-98 Tr. 1473-1478).

**Johnny Dockery and Ilam Davis.** For the first time in his "Declaration" attached to his Response, Defendant alleges that he asked counsel to call his son Johnny Dockery and a friend Ilam Davis to show that Denise Sutton was biased against him.

The record reveals that Mr. Dockery's claim that he was surprised that these witnesses were not called is palpably incredible. Mr. Dockery spoke up about other witnesses but did not

---

[2].    *See Thomas v. United States,* 772 A.2d 818, 823 (D.C. 2001) (trial court did not err in summarily denying defendant's second D.C. Code § 23-110 motion which was filed after his initial D.C. Code § 23-110 motion even though still during the pendency of his direct appeal, where defendant failed to show cause and prejudice.

complain to the Court about the absence of these witnesses before he rested his defense. Many other witnesses and the difficulties in securing their presence were discussed in Dockery's presence as the defense case proceeded (8-25-98 Tr. 1117, 1120, 1203; 8-27-98 Tr. 1469, 1473-1478). Mr. Dockery participated actively in discussions of missing witnesses but never mentioned these witnesses. Mr. Dockery complained, for example, about the absence of Ms. Howard and others but never complained about the absence of his son or Ms. Davis. Therefore, the Court does not believe that at the time of trial, Mr. Dockery wanted Johnny Dockery or Ilam Davis as witnesses.

Furthermore, Defendant shows no prejudice. Defendant does not submit affidavits from these witnesses. He does submit notes indicating that trial counsel's investigator interviewed them and that trial counsel was aware of their potential testimony about Ms. Sutton's unhappiness with having to pay rent and her anger at Defendant for not helping her raise their child. Trial counsel used his professional judgment to explore Ms. Sutton's bias in cross-examination rather than by calling these witnesses. Counsel asked her about her relationship with Johnny Dockery, the fact that she had been required to pay rent to stay in Dockery's building in New York, and her anger at Defendant (7-28-98 Tr. 221-222, 266-267). Defendant's son and Ms. Davis would not have added anything of significance to the defense case.

### Conclusion

Having considered all of Defendant's claims on the merits and having reviewed the record including portions of the trial transcripts, the Court concludes that none of Defendant's claims warrant a new trial and an evidentiary hearing would serve no useful purpose. Some of Defendant's claims are too vague and conclusory to warrant a hearing. Others are contradicted

22

by the record and are palpably incredible.  Still others would not warrant relief even if proved at a hearing. *Dobson v. United States*, 711 A.2d 78, 83 (D.C. 1998); *Young v. United States*, 639 A.2d 92 (D.C. 1994).

**JUDGMENT**

Based on the preceding findings of fact and conclusions of law, it is this $14$ day of January 2002, hereby

**ORDERED** that Defendant's Motion pursuant to D.C. Code § 23-110 to vacate his convictions for ineffective assistance of counsel and for new trial or dismissal based on newly discovered evidence is **DENIED;** and it is further

**ORDERED** that, upon resolution of the direct appeal or earlier direction from the Court of Appeals, the case be remanded to this Court for correction of sentence for first-degree murder while armed (count A).

MARY ELLEN ABRECHT, JUDGE
(signed in chambers)

Attachments

Copies to:

Jasper L. Dockery
Reg. No. 39631-053
U.S. Penitentiary, Box PMB
601 McDonough Blvd. S.E.
Atlanta Georgia 30315

Richard K. Gilbert, Esq.
307 G Street, N.W.
Washington, D.C.  20001

Carolyn K. Kolben
Assistant United States Attorney
Special Proceedings Section

Francis Lacey, Esq.
751 Rockville Pike, Suite 7
Rockville, MD 20852

24

**Appendix A**

SUPERIOR COURT

OF THE

DISTRICT OF COLUMBIA

Holding a Criminal Term

Grand Jury Sworn in on July 10, 1995

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA | : | Criminal No: F-4124-95 |
| v. | : | (GJO) |
| | : | |
| COREY BULLOCK | : | Violation:   22 D.C. Code |
| PDID 455-280; | : | 2401, 3202; |
| JASPER LLOYD DOCKERY | : | 22 D.C. Code 501, |
| aka "Jamaican Tee" and "Tee" | : | 3202; 22 D.C. |
| PDID 416-584. | : | Code 3204(b); |
| | : | 22 D.C. Code |
| | : | 3204(a); 22 D.C. |
| | : | Code 105(a); |
| | : | 22 D.C. Code |
| | : | 722(a)(2)(A) |

(First Degree Murder While Armed (Premeditated); Assault With Intent To Kill While Armed; Possession Of a Firearm During Crime Of Violence Or Dangerous Offense; Carrying a Pistol Without a License); Conspiracy; Obstruction of Justice)

The Grand Jury charges:

FIRST COUNT:

Corey Bullock, Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and other persons whose identities are unknown to the grand jury, within the District of Columbia, while armed with firearms, purposely and with deliberate and premeditated malice, killed Melvin Lorenzo Jones, by shooting him with firearms on or about April 15, 1995, thereby causing injuries from which Melvin Lorenzo Jones died on or about May 12, 1995.  (First Degree Murder While Armed (Premeditated), in violation of 22 D.C. Code, Section 2401, 3202)

Appendix A

**SECOND COUNT:**

On or about April 15, 1995, within the District of Columbia, Corey Bullock, Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and other persons whose identities are unknown to the grand jury, while armed with firearms assaulted Eugene Smith, aka Gino, with intent to kill Eugene Smith, aka Gino. (Assault With Intent To Kill While Armed, in violation of 22 D.C. Code, Section 501, 3202)

**THIRD COUNT:**

On or about April 15, 1995, within the District of Columbia, Corey Bullock, Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and other persons whose identities are unknown to the grand jury, while armed with firearms assaulted Troy Lee Smith, with intent to kill Eugene Smith, aka Gino. (Assault With Intent To Kill While Armed, in violation of 22 D.C. Code, Section 501, 3202)

**FOURTH COUNT:**

On or about April 15, 1995, within the District of Columbia, Corey Bullock, Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and other persons whose identities are unknown to the grand jury, while armed with firearms assaulted Emanuel McIver, aka Bey, with intent to kill Eugene Smith, aka Gino. (Assault With Intent To Kill While Armed, in violation of 22 D.C. Code, Section 501, 3202)

**FIFTH COUNT:**

On or about April 15, 1995, within the District of Columbia, Corey Bullock, Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and other persons whose identities are unknown the grand jury did possess firearms, that is, pistols or imitations thereof, while committing the crimes of murder and assault as set forth in the first, second, third, and fourth counts of this indictment. (Possession Of a Firearm During Crime Of Violence Or Dangerous Offense, in violation of 22 D.C. Code, Section 3204(b))

**SIXTH COUNT:**

On or about April 15, 1995, within the District of Columbia, Corey Bullock did carry, openly and concealed on or about his person, a pistol, without a license therefor issued as provided by law. (Carrying a Pistol Without a License, in violation of 22 D.C. Code, Section 3204(a))

**SEVENTH COUNT:**

On or about April 15, 1995, within the District of Columbia, Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," did carry, openly and concealed on or about his person, a pistol, without a license therefor issued as provided by law. (Carrying a Pistol Without a License, in violation of 22 D.C. Code, Section 3204(a))

**EIGHTH COUNT:**

Between on or about June 15, 1995 and August 15, 1995, within the District of Columbia, Corey Bullock, Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and others known to the grand jury, unlawfully, feloniously, wilfully, and

knowingly did conspire and agree together to commit criminal offenses in the District of Columbia in violation of 22 D.C. Code, Sections 722, 2511 and 2512.

## OBJECT OF THE CONSPIRACY

It was part of the conspiracy that Corey Bullock, Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and others known to the grand jury, would present false testimony and procure other persons to present false testimony at the preliminary hearing and before the grand jury in a first-degree murder case pending against Corey Bullock, United States v. Corey Bullock, F4124-95.

## OVERT ACTS

In furtherance of the conspiracy and to effect the objects thereof, the following overt acts, among others, were committed in the District of Columbia.

1.    On or about June 20, 1995, Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," Michael C. Burns, and Willie Edward Ford, and others known to the grand jury, met together at the apartment of Jasper Lloyd Dockery to script out false testimony which Michael C. Burns and Willie Edward Ford would later present at the June 23, 1995 preliminary hearing in a murder case against Corey Bullock, United States v. Corey Bullock, F4124-95;

2.    On or about June 20, 1995, Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," instructed Michael C. Burns, Willie Edward Ford, and others known to the grand jury, to falsely testify at the June 23, 1995 preliminary hearing in

United States v. Corey Bullock, F4124-95, that they were eyewitnesses to the murder with which Corey Bullock was charged and that Corey Bullock was not inside the car from which the shots were fired;

3.    On or about June 21 or 22, 1995, Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," spoke to Corey Bullock on the telephone and told him the names of the witnesses who had agreed to testify falsely for the defense at the June 23, 1995 preliminary hearing in United States v. Corey Bullock, F4124-95;

4.    On or about June 23, 1995, Willie Edward Ford, and others known to the grand jury, provided false testimony at the preliminary hearing of Corey Bullock in United States v. Corey Bullock, F4124-95, in an attempt to convince the Superior Court judge that Corey Bullock did not participate in the murder;

5.    On or about June 23, 1995, Michael C. Burns, and others known to the grand jury, provided false testimony at the preliminary hearing of Corey Bullock in United States v. Corey Bullock, F4124-95, in an attempt to convince the Superior Court judge that Corey Bullock did not participate in the murder;

6.    Between on or about June 24, 1995 and August 15, 1995, Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and others at his instruction, repeatedly made visits to the home of Willie Edward Ford to persuade Willie Edward Ford to not change his story and to not admit to the grand jury in United States v. Corey Bullock, F4124-95, that the testimony given by Willie Edward Ford and Michael C. Burns at the June 23, 1995 preliminary hearing was untrue;

7.   Between on or about June 24, 1995 and August 15, 1995, Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and others at his instruction, repeatedly made visits to the home of Willie Edward Ford in an attempt to persuade Ford's mother, Deborah Stokes, to provide false testimony before the grand jury in <u>United States v. Corey Bullock</u>, F4124-95, which would corroborate the false testimony originally provided by Willie Edward Ford;

(Conspiracy, in violation of 22 D.C. Code, Section 105(a))

**NINTH COUNT:**

On or about July 22, 1995, within the District of Columbia, Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and others known to the grand jury, willfully endeavored by means of intimidation, physical force, threatening communication, and corrupt persuasion, to influence, delay and prevent the truthful testimony of Margaret Smith in an official proceeding in the case of <u>United States v. Corey Bullock</u>, Case Number F-4124-95, then pending in the Superior Court of the District of Columbia.

(Obstruction of Justice, in violation of 22 D.C. Code 722(a)(2)(A))

**TENTH COUNT:**

On or about July 22, 1995, within the District of Columbia, Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and others known to the grand jury, willfully endeavored by means of intimidation, physical force, threatening communication, and corrupt persuasion, to influence, delay and prevent the truthful testimony of Troy Smith in an official proceeding in the case of <u>United States v. Corey Bullock</u>, Case Number F-4124-95, then pending in the Superior Court of the District of Columbia. (Obstruction of Justice, in violation of 22 D.C. Code 722(a)(2)(A))

**ELEVENTH COUNT:**

On August 11, 1995, within the District of Columbia, Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and others known to the grand jury, willfully endeavored by means of intimidation, physical force, threatening communication, and corrupt persuasion, to influence, delay and prevent the truthful testimony of Deborah Stokes in an official proceeding in the case of <u>United States v. Corey Bullock</u>, Case Number F-4124-95, then pending in the Superior Court of the District of Columbia. (Obstruction of Justice, in violation of 22 D.C. Code 722(a)(2)(A))

**TWELFTH COUNT:**

On August 11, 1995, within the District of Columbia, Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and others known to the grand jury, willfully endeavored by means of intimidation, physical force, threatening communication, and

**SUPERIOR COURT**

**OF THE**

**DISTRICT OF COLUMBIA**

**Holding a Criminal Term**

**Grand Jury Sworn in on July 10, 1995**

| | |
|---|---|
| **THE UNITED STATES OF AMERICA** : | **D.C. Superior Court Case #F153-96** |
| **v.** : | **Violation:**    22 D.C. Code |
| **COREY BULLOCK** : | 2401, 3202; |
| **PDID 455-280;** : | 22 D.C. Code 501, |
| **JASPER LLOYD DOCKERY** : | 3202; 22 D.C. |
| **aka "Jamaican Tee" and "Tee"** : | Code 3204(b); |
| **PDID 416-584.** : | 22 D.C. Code |
| : | 3204(a); 22 D.C. |
| : | Code 105(a); |
| : | 22 D.C. Code |
| : | 722(a)(2)(A) |

**(First Degree Murder While Armed (Premeditated); Assault With Intent To Kill While Armed; Possession Of a Firearm During Crime Of Violence Or Dangerous Offense; Carrying a Pistol Without a License); Conspiracy; Obstruction of Justice)**

The Grand Jury charges:

**FIRST COUNT:**

Corey Bullock, Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and other persons whose identities are unknown to the grand jury, within the District of Columbia, while armed with firearms, purposely and with deliberate and premeditated malice, killed Melvin Lorenzo Jones, by shooting him with firearms on or

**SUPERIOR COURT**

**OF THE**

**DISTRICT OF COLUMBIA**

**Holding a Criminal Term**

**Grand Jury Sworn in on December 18, 1995**

| | |
|---|---|
| **THE UNITED STATES OF AMERICA** : | **Criminal No:** F-8954-95 |
| : | (GJO) F536-96 |
| **v.** : | |
| : | **Violation:**    22 D.C. Code |
| **HARRY L. WILLIAMS,** : | 2401, 3202; |
| aka "H.L." : | 22 D.C. Code 501, |
| PDID 439-474, and : | 3202; 22 D.C. |
| : | Code 3204(b); |
| **JASPER LLOYD DOCKERY** : | 22 D.C. Code |
| aka "Jamaican Tee" : | 3204(a); 6 D.C. |
| and "Tee" : | Code 2361(3). |
| PDID 416-584. : | |
| : | (First Degree Murder While Armed |
| : | (Premeditated); Assault With |
| : | Intent To Kill While Armed; |
| | Possession Of a Firearm During |
| | Crime Of Violence Or Dangerous |
| | Offense; Carrying a Pistol |
| | Without a License); Unlawful |
| | Possession of Ammunition |

The Grand Jury charges:

**FIRST COUNT:**

Harry L. Williams, also known as "H.L.," Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and other persons whose identities are unknown to the grand jury, within the District of Columbia, while armed with firearms, purposely and with deliberate and premeditated malice, killed James Ivy, by shooting him with firearms on or about July 27, 1995, thereby causing injuries from which James Ivy died on or about July 27, 1995. (First Degree Murder While Armed (Premeditated), in violation of 22 D.C. Code, Section 2401, 3202)

Appendix B

**SECOND COUNT:**

On or about July 27, 1995, Harry L. Williams, also known as "H.L.," Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and other persons whose identities are unknown to the grand jury, within the District of Columbia, while armed with firearms assaulted Willie Ashmon, also known as "Reds," with intent to kill Willie Ashmon, also known as "Reds." (Assault With Intent To Kill While Armed, in violation of 22 D.C. Code, Section 501, 3202)

**THIRD COUNT:**

On or about July 27, 1995, Harry L. Williams, also known as "H.L.," Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and other persons whose identities are unknown to the grand jury, within the District of Columbia, while armed with firearms assaulted James Conyers, also known as "Fats," with intent to kill Willie Ashmon, also known as "Reds." (Assault With Intent To Kill While Armed, in violation of 22 D.C. Code, Section 501, 3202)

**FOURTH COUNT:**

On or about July 27, 1995, Harry L. Williams, also known as "H.L.," Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and other persons whose identities are unknown to the grand jury, within the District of Columbia, while armed with firearms assaulted Kinikki Brown, with intent to kill Willie Ashmon, also known as "Reds." (Assault With Intent To Kill While Armed, in violation of 22 D.C. Code, Section 501, 3202)

corrupt persuasion, to influence, delay and prevent the truthful testimony of Willie Edward Ford in an official proceeding in the case of <u>United States v. Corey Bullock</u>, Case Number F-4124-95, then pending in the Superior Court of the District of Columbia. (Obstruction of Justice, in violation of 22 D.C. Code 722(a)(2)(A))

Attorney of the United States in
and for the District of Columbia

A TRUE BILL:

Foreperson

**Appendix  B**

*E*

**FIFTH COUNT:**

On or about July 27, 1995, Harry L. Williams, also known as "H.L.," Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and other persons whose identities are unknown to the grand jury, within the District of Columbia, while armed with firearms assaulted Shavaughn Royal, with intent to kill Willie Ashmon, also known as "Reds." (Assault With Intent To Kill While Armed, in violation of 22 D.C. Code, Section 501, 3202)

*F*

**SIXTH COUNT:**

On or about July 27, 1995, Harry L. Williams, also known as "H.L.," Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and other persons whose identities are unknown to the grand jury, within the District of Columbia, while armed with firearms assaulted Jasmine Chambers, with intent to kill Willie Ashmon, also known as "Reds." (Assault With Intent To Kill While Armed, in violation of 22 D.C. Code, Section 501, 3202)

*G*

**SEVENTH COUNT:**

On or about July 27, 1995, Harry L. Williams, also known as "H.L.," Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and other persons whose identities are unknown to the grand jury, within the District of Columbia, while armed with firearms assaulted Everett Newman, with intent to kill Willie Ashmon, also known as "Reds." (Assault With Intent To Kill While Armed, in violation of 22 D.C. Code, Section 501, 3202)

**EIGHTH COUNT:**

On or about July 27, 1995, Harry L. Williams, also known as "H.L.," Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and other persons whose identities are unknown to the grand jury, within the District of Columbia, did possess firearms, that is, pistols or imitations thereof, while committing the crimes of murder and assault as set forth in the first, second, third, fourth, fifth, sixth, and seventh counts of this indictment. (Possession Of a Firearm During Crime Of Violence Or Dangerous Offense, in violation of 22 D.C. Code, Section 3204(b))

**NINTH COUNT:**

On or about July 27, 1995, Harry L. Williams, also known as "H.L.," Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and other persons whose identities are unknown to the grand jury, within the District of Columbia, did possess firearms, that is, a shotgun or imitation thereof, while committing the crimes of murder and assault as set forth in the first, second, third, fourth, fifth, sixth, and seventh counts of this indictment. (Possession Of a Firearm During Crime Of Violence Or Dangerous Offense, in violation of 22 D.C. Code, Section 3204(b))

**TENTH COUNT:**

On or about July 27, 1995, Harry L. Williams, also known as "H.L.," within the District of Columbia, did carry, openly and concealed on or about his person, a pistol, without a license therefor issued as provided by law.  (Carrying a Pistol Without a License, in violation of 22 D.C. Code, Section 3204(a))

**ELEVENTH COUNT:**

On or about July 27, 1995, Harry L. Williams, also known as "H.L.," Jasper Lloyd Dockery, also known as "Jamaican Tee" and "Tee," and other persons whose identities are unknown to the grand jury, within the District of Columbia, did possess ammunition without being the holder of a valid registration certificate for a firearm.  (Possession of Unregistered Ammunition, in violation of 6 D.C. Code, Section 2361(3))

_____
Attorney of the United States in
and for the District of Columbia

A TRUE BILL:

_____
Foreperson

**Appendix  C**

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CRIMINAL DIVISION

UNITED STATES OF AMERICA
DISTRICT OF COLUMBIA

**v.**

Jasper Lloyd Dockery

2127 Pitkin Avenue

Brooklyn, NY 11203

Criminal No. ___GJO___

PDID No. ___416-584___

Officer in Charge __Pam Reed__

Issued By _____
                          Judge

D.C. Superior Court Case #F153-96

| DOB: | 10/20/46 | |
|------|----------|--|
| Sex: Male | Height: 6'0" | Weight: 195 lbs |

## BENCH WARRANT
### (Valid in the District of Columbia Only)

To:  United States Marshal
      Chief of Police of the District of Columbia

You are hereby commanded to arrest ____Jasper Lloyd Dockery____ and bring (him) (her) forthwith before the Criminal Division of the Superior Court of the District of Columbia to answer to the (indictment) (complaint) (information) (subpoena) charging (him) (her) with ____First Degree Premeditated Murder While Armed____

in violation of __22 D.C. Code, Section 2401__

Hereof fail not, and have then this writ so endorsed as to show how you have executed it.

WITNESS, The Honorable Chief Judge of the Superior Court of the District of Columbia under the seal of said Court this ___5th___ day of ___January___, 19_96_.

Bond Set: _No bond_                    ——— Superior Court of the District of Columbia

By: _____
        (Judge) (Deputy Clerk)

Appendix C