**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
JASPER L. DOCKERY,

                     **Plaintiff,**

             -against-

NATHAN TUCKER, et al.,
                   **Defendants.**
-------------------------------------------------------------x

**REPORT AND**
**RECOMMENDATION**

**97-CV-3584 (ARR)**

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

On September 6, 2006, this Court issued a 66-page Report and Recommendation

("9/6/06 R&R") addressing the cross-motions for summary judgment filed by the two sets of

defendants and by *pro se* plaintiff Jasper Dockery ("Dockery" or "plaintiff"). The Court

recommended that defendants' motions be granted in part and denied in part, and that

plaintiff's cross-motion be denied in its entirety. Over the course of the next several months,

the various parties filed objections to and/or motions for reconsideration of the Report and

Recommendation, and all such motions have been referred to the undersigned magistrate judge

by the Honorable Allyne R. Ross. For the reasons that follow, this Court adheres to its earlier

recommendations. In addition, one group of defendants has now moved for summary

judgment on a set of claims overlooked in their earlier motion papers; the Court recommends

that that motion be granted.

<u>**OVERVIEW**</u>

Familiarity with the Court's Report and Recommendation [ECF document #271] is

assumed. Briefly stated, this action concerns two attempts by various law enforcement officers

to arrest plaintiff at his Brooklyn residence and return him to the District of Columbia to face

criminal charges. The first incident occurred on October 23, 1995, when law enforcement officers, armed with an arrest warrant issued in August 1995, broke into the premises at 2127 Pitkin Avenue in Brooklyn (the "Premises"), but were unable to locate plaintiff. The second incident occurred on February 6, 1996, when law enforcement officers again broke into the Premises and this time found plaintiff concealed in a hiding space between the ceiling of the first floor and floorboards of the second. Plaintiff has sued Special Agent Nathan Tucker ("Tucker"), one of the FBI agents at the scene on both occasions, as well as the District of Columbia ("the District") and various of its officers and officials, including Detectives Pamela Reed ("Reed") and Phineas Young ("Young") of the Washington, D.C. Metropolitan Police Department (collectively the "D.C. defendants").

Each of the parties has found fault with some aspects of the Court's Report and Recommendation. Tucker moved for reconsideration on September 29, 2006. In that motion, Tucker argues that plaintiff should be collaterally estopped from relitigating the legality of the 1995 entry and search, which he claims was actually litigated during one of plaintiff's criminal prosecutions in the District of Columbia. He also argues that this Court overlooked the surrounding circumstances and failed to consider Tucker's defense of qualified immunity when it concluded that there were genuine issues of fact as to whether the agents had reason to believe that plaintiff was on the Premises at the time of the 1995 entry. Tucker further contends that Judge Ross' earlier dismissal of the Fourth Amendment claims against Tucker in connection with the 1996 search[1] compels the same result with respect to the 1995 claims. See

---

[1] See Dockery v. Tucker, 73 F.Supp.2d 224, 240 (E.D.N.Y. 1998).

generally Defendant Special Agent Nathan Tucker's Memorandum Of Law In Support Of Motion For Partial Reconsideration Of The September 6, 2006 Report And Recommendation ("Tucker Recons. [#280]").

On September 19, 2006, the D.C. defendants filed objections to the Report and Recommendation. Although their summary judgment motion failed to address the 1996 claims against them,[2] they now contend that this was due to an oversight, and they urge the Court to consider their belated challenge based on lack of personal involvement and qualified immunity. Assailing the Court's conclusion that genuine issues of fact exist as to the 1995 search, the D.C. defendants characterize plaintiff's factual account as implausible and based on hearsay. See generally Objections To The Report And Recommendation Filed By Roanne L. Mann, United States Magistrate Judge, On September 6, 2006, By Defendants District Of Columbia, Pamela Reed And Phineas Young ("D.C. Obj. [#275]").

In late October and November 2006, plaintiff filed objections to and sought reconsideration of the Report and Recommendation and responded to Tucker's submission. Plaintiff complains that the August 1995 arrest warrant on which the officers relied specified an address in Maryland and that therefore they had no right to enter the Premises in Brooklyn. In response to this Court's conclusion that plaintiff is collaterally estopped from relitigating the validity of the August 1995 arrest warrant, and Tucker's argument that plaintiff should be similarly estopped from challenging the legality of the 1995 entry and search, plaintiff contends that he was denied a full and fair opportunity to litigate those issues in the D.C. courts. He

---

[2] Judge Ross had dismissed the 1996 claims against Tucker only. See Dockery, 73 F.Supp.2d at 240 n.13.

resists dismissal of his *Monell* claim,[3] on the ground that he was denied *Monell* discovery, and he seeks a ruling that his tort claims against the United States are timely by virtue of the Westfall Act. See generally Plaintiff Jasper Dockery's Memorandum Of Law, Objections, And Motion For Reconsideration Of The Magistrate Judge September 6, 2006 Report and Recommendation ("Pl. Obj. [#285]"); Plaintiff Dockery Opposition Motion To Defendant Tucker Motion For Partial Reconsideration Of The September 6, 2006 Report And Recommendation Of The District Court Magistrate Judge ("Pl. Opp. [#289]"); Supplemental Affidavit Of Dockery Jasper, Opposing Agent Tucker's Motion For Partial Reconsideration ("Pl. Supp. [#290]").

In November 2006, both groups of defendants opposed plaintiff's motion for reconsideration and moved to strike it as untimely. See generally Defendant Special Agent Nathan Tucker's Memorandum Of Law In Opposition To Plaintiff's Objections To The September 6, 2006 Report And Recommendation ("Tucker Opp. [#287]"); Opposition On Behalf Of Defendants, Pamela Reed, Phineas Young, District Of Columbia, Alan Dreher, And Larry Soulsby To Plaintiff Dockery's Motion For Objections And Reconsideration And In Further Support Of Defendant Nathan Tucker's Motion For Partial Reconsideration Of The September 6, 2006 Report And Recommendation ("D.C. Opp. [#288]"). At the same time, the D.C. defendants belatedly are seeking to adopt Tucker's motion for reconsideration and make it applicable to all defendants and both searches. See D.C. Opp. [#288] at 3.

_____

[3] Monell v. Dep't of Social Servs., 436 U.S. 658, 690 (1978).

-4-

**DISCUSSION**

I.     **COLLATERAL ESTOPPEL**

In its 9/6/06 Report and Recommendation, the Court recommended that plaintiff be collaterally estopped from challenging the validity of the August 1995 obstruction-of-justice arrest warrant on which the agents relied in entering the Premises in October 1995; the Court concluded that the same challenge had been rejected by the D.C. Superior Court in connection with plaintiff's collateral attack on one of his criminal convictions.  See 9/6/06 R&R [#271] at 40-43; United States v. Dockery, No. F-536-96, 2002 WL 33944042, at *3, 10-11 (D.C. Super. Jan. 14, 2002).[4]  Defendants for the first time argue that plaintiff should be collaterally estopped from litigating the lawfulness of the 1995 entry and search, and not just the validity of the warrant.  See Tucker Recons. [#280] at 5-7; D.C. Opp. [#288] at 5-6, 9.  Dockery counters that there should be no collateral estoppel at all, as he claims to have been denied a full and fair opportunity to litigate the Fourth Amendment issues in the D.C. court.  See Pl. Obj. [#285] at 5-7.  Both sides are wrong.

The Full Faith and Credit Clause of the Constitution, as implemented by 28 U.S.C. § 1738, requires federal courts to "refer to the preclusion law of the State in which judgment was rendered." Marrese v. Am. Acad. of Orthopaedic Surgeons, 470 U.S. 373, 380 (1985); see also Migra v. Warren City Sch. Dist., 465 U.S. 75, 81 (1984); Cameron v. Fogarty, 806 F.2d 380, 384 (2d Cir. 1986) ("[Section 1738] requires that a federal court give effect to at least the res judicata and collateral estoppel rules of the state when a state-court judgment is in

─────────────────

[4]  The D.C. court's opinion is reproduced, in slip opinion form, as docket entry #270 (hereinafter "1/14/02 Mem.").

question."). Because the pending motions concern a ruling by the Superior Court of the

District of Columbia, this Court must look to D.C. law on collateral estoppel.

Under D.C. case law, collateral estoppel, or issue preclusion, entails a four-step analysis:

> [C]ollateral estoppel . . . renders conclusive in the same or a subsequent action determination of an issue of fact or law when (1) the issue is actually litigated and (2) determined by a valid, final judgment on the merits; (3) after a full and fair opportunity for litigation by the parties or their privies; (4) under circumstances where the determination was essential to the judgment, and not merely dictum.

Modiri v. 1342 Rest. Group, Inc., 904 A.2d 391, 394 (D.C. 2006) (quoting Davis v. Davis,

663 A.2d 499, 501 (D.C. 1995)); see also District of Columbia v. Gould, 852 A.2d 50, 55

(D.C. 2004) ("[U]nder the doctrine of collateral estoppel or issue preclusion, once an issue of

fact or law has been actually and necessarily determined against a party by a court of

competent jurisdiction, that determination is conclusive on that party in any subsequent

proceeding against that party based on a different cause of action.").

**A. The Defense Motion**

D.C. courts have strictly construed the first step of the collateral estoppel test. For

preclusion to apply, the issue "must have been raised and litigated, and actually adjudged" in

the prior proceeding. Goldkind v. Snider Bros., Inc., 467 A.2d 468, 473 (D.C. 1983) (quoting

1B James Wm. Moore, Moore's Federal Practice § 0.443[1], at 3901 (2d ed. 1982)). In

contrast to the doctrine of res judicata, which bars "relitigation of . . . those matters . . . which

*might have been* litigated in the first proceeding,"[5] the more limited scope of collateral estoppel reaches only those issues that "have been actually litigated and necessarily decided in the former proceeding." Goldkind, 467 A.2d at 473 n.10 (emphasis in original); see also Carr v. Rose, 701 A.2d 1065, 1077 (D.C. 1997) ("[P]reclusion applies only to issues actually litigated and determined, and not to matters which might have been raised in the first proceeding, but were not.") (quoting Lebeau v. Lebeau, 393 A.2d 480, 483-84 (Pa. Super. Ct. 1978)). To determine whether an issue has been "actually litigated," D.C. courts apply a three-prong test: the issue must have been "(1) properly raised, by pleadings or otherwise, (2) submitted for determination, and (3) determined." Carr, 701 A.2d at 1076-77 (quoting Restatement (Second) of Judgments § 27 cmt. d (1982)); see also Ali Baba Co. v. WILCO, Inc., 482 A.2d 418, 422 (D.C. 1984). Furthermore, collateral estoppel does not apply where "the issues are not identical, even if the issues are similar." Short v. District of Columbia Dep't of Employment Serv., 723 A.2d 845, 849-50 (D.C. 1998); see also Gould, 852 A.2d at 56 ("[S]imilarity between issues is insufficient.").

In support of their argument that Dockery should be collaterally estopped from litigating any aspect of his Fourth Amendment claims, the defendants cite portions of the opinion of the D.C. Superior Court referring to the lawfulness of the 1995 search. See Tucker Recons. [#280] at 6-7; D.C. Opp. [#288] at 5; Dockery, 2002 WL 33944042, at *3 (noting

---

[5] Defendants understandably do not invoke the doctrine of res judicata, which has no application here, inasmuch as the criminal prosecution and this civil rights action involve different causes of action and parties. See Goldkind, 467 A.2d at 473-74 & n.10; see also Tucker Recons. [#280] at 7 (arguing that plaintiff should be "collaterally estopped" from challenging the 1995 entry and search of the Premises); D.C. Opp. [#288] at 6, 10 (same).

that Dockery had proffered "no reason for the Court to have found the October search unlawful."); id. ("The Government proffered reliable information about outstanding warrants for [Dockery's] arrest in October 1995, thereby making the entry and search of his premises lawful."). Nevertheless, an examination of that opinion, and of Dockery's submissions to the D.C. court,[6] reveals that with respect to the 1995 search, the only Fourth Amendment issue litigated in the D.C. court involved the validity of the August 1995 warrant. See id. at *3 (discussing "the existence at the time [in October 1995] of a valid felony arrest warrant for obstruction of justice"); see generally [Dockery's] Motion Pursuant To D.C. Code § 23-110 In Violation Of Ineffective Assistance Of Counsel [#284-2] at 10-15; Defendant's Response In Opposition To The Government's Response To The Defendant's Pro Se Motion To Set Aside Sentence And Dismissal Of Conviction [#284-3] at 11-27.

To be sure, Dockery could have argued in the D.C. court that the agents' entry into and search of the Premises was illegal even assuming the validity of the August 1995 obstruction-of-justice arrest warrant. He failed to do so, and thus the D.C. court never determined that precise issue. As previously discussed, collateral estoppel does not apply "to matters which might have been raised in the first proceeding, but were not," Carr, 701 A.2d at 1077, or in situations where "the issues are not identical, even if the issues are similar." Short, 723 A.2d at 849-50. Accordingly, plaintiff is not collaterally estopped from challenging the agents' efforts to execute the warrant in October 1995.[7]

_____

[6] Defendants have not proffered the government's submissions to the D.C. court.

[7] The D.C. defendants additionally argue that the decision of the D.C. court also resolved the

(continued...)

**B. Dockery's Motion**

Dockery contends that he did not have a full and fair opportunity in D.C. Superior Court to litigate the validity of the August 1995 arrest warrant and that therefore he should not be collaterally estopped from relitigating that issue in this proceeding. See Pl. Obj. [#285] at 5; Pl. Opp. [#289] at 10, 16-17. Dockery complains that he was not provided an evidentiary hearing, an opportunity to cross-examine Tucker or the D.C. officers, or access to police or FBI investigative files. See Pl. Obj. [#285] at 5-7; Pl. Opp. [#289] at 10, 16-17. Dockery's argument is legally and factually flawed.[8]

As Judge Mary Ellen Abrecht noted in rejecting petitioner's post-conviction challenge to his defense attorney's effectiveness, that attorney timely objected to Tucker's trial testimony regarding the October 1995 search, but his objection was overruled. See Dockery, 2002 WL 33944042, at *3; 1/14/02 Mem. [#270] at 6; [7/30/98 Trial Testimony Of Nathan Tucker In D.C. Superior Court] ("7/30/98 Tucker Test. [#281-2]") at 703-05. He was then afforded the

---

[7](...continued)
legality of the 1996 search. See D.C. Opp. [#288] at 6, 7, 9. However, the Fourth Amendment challenge litigated in and decided by the D.C. court with respect to the 1996 search was likewise limited to "the warrant issue . . . ." United States v. Dockery, No. F-536-96, 2002 WL 33944042, at *5 (D.C. Super. Jan. 14, 2002). Therefore, for the reasons discussed above in connection with the 1995 search, plaintiff is not collaterally estopped from challenging the 1996 search except to the extent his challenge concerns the validity of the underlying warrants for his arrests.

[8] Both groups of defendants urge the Court to strike Dockery's submissions as untimely. See Tucker Opp. [#287] at 1, 4; D.C. Opp. [#288] at 2-3, 4. This Court prefers to reach the merits of the parties' arguments, particularly where, as here, the delay was occasioned by a *pro se* prisoner. Moreover, given the various procedural violations on the part of the D.C. defendants, see *supra* p. 3; *infra* p. 12 note 12; *infra* pp. 24-27, they are in no position to complain of Dockery's tardiness.

opportunity to cross-examine Tucker about the warrant, but prudently chose not to do so, in light of the risk that that line of inquiry would open the door to testimony about the other warrants issued against his client. See 7/30/98 Tucker Test. [#281-2] at 724-26. Thus, petitioner was not precluded from developing his theory on cross-examination.

To be sure, Judge Abrecht, the trial judge, denied Dockery's post-judgment challenge to his conviction without an evidentiary hearing. See Dockery, 2002 WL 33944042, at *11; 1/14/02 Mem. [#270] at 20. She did, however, consider all the evidence and arguments proffered by petitioner -- including his oft-repeated and misguided reliance on NCIC data from 2001.[9] See Dockery, 2002 WL 33944042, at *3, 10-11; 1/14/02 Mem. [#270] at 6, 19-20. While Dockery now complains that he would have liked to cross-examine Tucker, the D.C. defendants and the prosecutor at a hearing, see Pl. Supp. [#290] at 3-4, he proffers no basis for believing that they would have provided testimony that was both material and favorable to his defense. As Dockery was not deprived of a full and fair opportunity in D.C. to challenge the validity of the August 1995 arrest warrant, he cannot escape the preclusive effect of collateral estoppel with respect to that issue. Cf. Rogers v. Johnson-Norman, 466 F.Supp.2d 162, 171-72 (D.C. Cir. 2006) (finding that prior proceedings satisfied collateral estoppel's requirement

---

[9] This case therefore bears no resemblance to Golino v. City of New Haven, 950 F.2d 864 (2d Cir. 1991), the case on which Dockery principally relies. In Golino, the accused was not permitted to offer any evidence at the state court hearing. See id. at 869-70. Here, in contrast, Dockery presented evidence to Judge Abrecht and she considered that evidence. His real complaint is not that she precluded him from developing his theory but that she rejected the inferences he sought to draw from that proof.

of full and fair opportunity to litigate).[10]

## II. OCTOBER 1995 FOURTH AMENDMENT CLAIMS: REASONABLENESS OF ENTRY

Tucker urges this Court to reconsider that portion of its 9/6/06 Report and Recommendation denying summary judgment on plaintiff's Fourth Amendment claims arising from the October 1995 entry into and search of the Premises. An FBI Fugitive Task Force, which included Tucker, executed the entry and search pursuant to the August 1995 warrant for plaintiff's arrest. Specifically, Tucker objects to the Court's conclusion that a genuine issue of material fact – i.e., concerning plaintiff's presence at the time the search was executed[11] – precluded granting Tucker summary judgment based on his qualified immunity defense. In his motion for reconsideration, Tucker suggests that it was objectively reasonable for the agents to mistakenly identify another person at the Premises as plaintiff. Tucker Recons. [#280] at 13-

---

[10] Petitioner also challenges the validity of the August 1995 arrest warrant on the ground that the warrant and/or underlying affidavit identified his home address as 4165 Southern Avenue, #T2, Capitol Heights, Maryland, rather than the Pitkin Avenue address in Brooklyn where he was eventually arrested. See Pl. Obj. [#285] at 4; Pl. Opp. [#289] at 19; see also id. at 24. Contrary to petitioner's argument, the validity of an arrest warrant is unaffected by the absence of, or inaccuracies in, information concerning the arrestee's address; as the Second Circuit has held, "[a]ny discrepancy between the address in the supporting affidavit and the address where [the accused] was ultimately arrested is irrelevant" to the validity of the arrest warrant. United States v. Lauter, 57 F.3d 212, 215 (2d Cir. 1995); see United States v. Stinson, 857 F.Supp. 1026, 1027 (D. Conn. 1994) (ruling that where the arresting officers have reason to believe that a suspect resides at and may be found at a certain residence, "the officers have the authority to execute an arrest warrant at such address, regardless of the address listed on the warrant") (cited with approval in Lauter). Therefore, petitioner's argument is unavailing.

[11] To comport with the Fourth Amendment, a law enforcement officer seeking to execute an arrest warrant in a home must meet what courts have interpreted as a two-part test: (1) a reasonable belief that the place searched is the suspect's residence, and (2) a reasonable belief that the suspect is present. See, e.g., Lauter, 57 F.3d at 215; United States v. Big Apple Bag Co., 317 F.Supp.2d 181, 186 (E.D.N.Y. 2004).

-11-

14. Alternatively, Tucker argues that even apart from that observation, there was sufficient undisputed evidence in the record to establish that the 1995 entry and search were reasonable. Id. at 10-11. Finally, Tucker asserts that the Court did not give proper weight to the fact that he was not the agent in charge of the search. Id. at 12-13. For the reasons set forth below, the Court adheres to its recommendation that the defense motion for summary judgment be denied with respect to these claims.[12]

### A. Mistaken Identity

Until this motion for reconsideration, Tucker has repeatedly asserted that, prior to attempting to execute the arrest warrant in October 1995, agents, including Tucker, observed plaintiff through a second-floor window of the Premises and, on that basis, entered the building. See Defendant Special Agent Nathan Tucker's Statement Of Undisputed Facts Pursuant To Local Civil Rule 56.1 ("Tucker 56.1 [#216]") at ¶ 16; Defendant Special Agent Nathan Tucker's Memorandum Of Law In Support Of His Motion To Dismiss Or In The Alternative For Summary Judgment On All Claims Asserted In The Third Complaint ("Tucker Mem. [#215]") at 15-16 ("In the instant action, however, Agent Tucker's task force actually viewed Dockery through the second floor window at the Premises while conducting direct

---

[12] Defendants Reed and Young belatedly seek to adopt Tucker's arguments. On September 19, 2006, Reed and Young filed objections to this Court's R&R but did not challenge the claims relating to the 1995 search on these grounds. See generally D.C. Obj. [#275]. Nor did they move for reconsideration. Instead, on November 15, 2006, months after the deadline for moving for reconsideration, see E.D.N.Y. Local Civ. R. 6.3, they filed their opposition to *pro se* plaintiff's challenge to the R&R and improperly sought in that document to piggyback onto Tucker's motion for reconsideration. See D.C. Opp. [#288], at 3, 9-10. Nevertheless, even if Reed and Young's procedural defects are overlooked, their arguments are unavailing for the reasons discussed in connection with Tucker's motion for reconsideration.

surveillance. Thus, common sense factors clearly indicated Dockery's presence.") (internal citations omitted). In fact, Tucker previously testified as such at Dockery's criminal trials. <u>See</u> 7/30/98 Tucker Test. [#281-2] at 708 ("But I did personally see [Dockery] in the window, yes. . . . At that point, once he was observed in the window, we deployed people around the rear of the building before we actually knocked on the door."); <u>id.</u> at 732 ("We determined [which apartment Dockery resided in] by seeing him in the window on the second floor."); [1/23/97 Trial Testimony Of Nathan Tucker In D.C. Superior Court] ("1/23/97 Tucker Test. [#32]") at 220-22.[13]  In connection with the instant civil action, Tucker proffered this observation in support of his reasonable belief that Dockery was present at the time the FBI agents attempted to execute the warrant in October 1995. <u>See</u> Tucker Mem. [#215] at 15.

Recasting his argument, Tucker now contends that, in the event he was mistaken in his belief that he spotted plaintiff in the window, his mistake was objectively reasonable and, thus, triggered qualified immunity protection. <u>See</u> Tucker Recons. [#280] at 13.  Specifically, Tucker argues that "another adult male, Michael Barrett, was present at the scene and could have been mistaken for plaintiff Dockery." <u>Id.</u>

Qualified immunity is available when a government official establishes that it was "objectively reasonable for him to believe his actions were lawful at the time of the challenged act." <u>Lennon v. Miller</u>, 66 F.3d 416, 420 (2d Cir. 1995) (internal citations omitted).  To determine what is objectively reasonable, courts consider whether "officers of reasonable

_____

[13]  The 1/23/97 transcript is electronically filed as an attachment to Dockery's Supplemental Affidavit (Pl. Supp. [#290]) and a more legible copy is appended to Plaintiff's Motion In Opposing Defendant [L]egal [A]id Attorney Motion [ . . .] [#32].

competence could disagree on the legality of the defendant's actions" based upon the information possessed by the defendant officer at the time of the conduct at issue. Id. (internal citations omitted); see Taft v. Vines, 70 F.3d 304, 311 (4th Cir. 1995) (granting qualified immunity to officers who pulled over wrong vehicle because they had sufficient reasonable suspicion), aff'd on rehearing en banc, 83 F.3d 681, 683-84 (4th Cir. 1996); Velardi v. Walsh, 40 F.3d 569, 576 (2d Cir. 1994) (granting qualified immunity when it was objectively reasonable for officers to interpret warrant to refer to a different house than one listed in warrant, after speaking with occupants of listed house); cf. Maryland v. Garrison, 480 U.S. 79, 88 (1998) (holding that search of wrong apartment was not unconstitutional because officers had reasonable belief building floor contained one apartment); Dean v. City of Worcester, 924 F.2d 364, 367-68 (1st Cir. 1991) (holding officer's mistake as to arrestee's identity to be reasonable).[14]

What the cases cited by Tucker have in common – and what the instant case lacks – is a factual basis for determining that the alleged mistake was reasonable. See, e.g., Taft, 70 F.3d at 312 (deciding qualified immunity based on the "information *actually* possessed by the officers at the critical time") (emphasis in original); Dean, 924 F.2d at 367-68 (finding record established officer's mistaken identification was reasonable under the Fourth Amendment). For example, in *Dean*, the officers who made the mistaken arrest submitted affidavits attesting to the physical similarities between the arrestee and the intended suspect. Id. at 368. The First

---

[14] In his motion for reconsideration, Tucker misconstrues the holdings of Maryland v. Garrison and Dean v. City of Worcester as granting qualified immunity. See Tucker Recons. [#280] at 13-14. These cases address whether the officers' actions were reasonable under the Fourth Amendment; qualified immunity was not an issue before the respective courts. See Maryland v. Garrison, 480 U.S. at 80-81; see also Dean, 924 F.2d at 366-67.

Circuit concluded that this created a reasonable basis for a finding of mistaken identity.  Id.

Here, in contrast, the record contains no evidence on which to compare the physical appearances of Michael Barrett and Dockery and on which to conclude that it was objectively reasonable to mistake one for the other.  In fact, there is no descriptive information whatsoever – age, race, height, weight – as to Michael Barrett.[15]  The Court thus has been furnished no factual record upon which to find that reasonable officers might agree or disagree as to the legality of the entry into the Premises based on the alleged sighting.  Cf. Lennon, 66 F.3d at 421 (stating that courts "should assess the reasonableness of the defendants' conduct *under the circumstances presented* in order to determine on summary judgment whether the defendants are entitled to qualified immunity") (emphasis added).  Consequently, Tucker's qualified immunity defense does not entitle him to summary judgment based on mistaken identity.  See Jenkins v. City of New York, 478 F.3d 76, 87-89 (2d Cir. 2007) (reversing grant of summary judgment based on mistaken identity and qualified immunity where comparison of description of suspect and plaintiff's appearance "revealed only two common characteristics":  both were "male and black").

## B.  Other Facts Bearing On Reasonable Belief Of Presence

An officer may execute an arrest warrant in a residence when "there is a *reasonable belief* that the suspect resides at the place to be entered to execute [the] warrant, and [when] the

---

[15]  The October 18, 1995 FBI Lead on which Tucker acted enclosed a photograph of Dockery and described him as a black male born in Jamaica in either 1946 or 1944, six feet tall and weighing 195 pounds.  See [FBI Lead] at 2-3 (submitted as Exhibit A to the Declaration Of Special Agent Nathan Tucker In Support Of Summary Judgment Motion ["Tucker Decl. [#217"]).

officers have reason to believe that the suspect is present." United States v. Lovelock, 170 F.3d 339, 343 (2d Cir. 1999) (quoting United States v. Lauter, 57 F.3d 212, 215 (2d Cir. 1995)) (emphasis supplied in Lauter). The standard for reasonable belief is less stringent than probable cause. See, e.g., Bartlett v. City of New York, 03-CV-1961 (CPS), 2005 WL 887112, at *5 (E.D.N.Y. Feb. 11, 2005). As Tucker correctly notes, see Tucker Recons. [#280] at 14, an officer who relies on common sense factors pointing to the suspect's presence at the time the warrant is executed may reasonably believe a suspect is present even if the officer does not actually observe the suspect. See, e.g., Valdez v. McPheters, 172 F.3d 1220, 1226 (10th Cir. 1999).

When Tucker initially moved for summary judgment, he listed only two factors relating to his reasonable belief that Dockery was present: (1) a vague statement in the October 18, 1995 FBI Lead that Dockery "may be located in the vicinity of the '3 Star Grocery,'" and (2) the agents' observation of Dockery. See Tucker Mem. [#215] at 15-16. Tucker now argues that the Court ignored other indicia that Dockery was present. See Tucker Recons. [#280] at 11. The "totality of facts" that Tucker alleges the Court overlooked consist of the crimes with which Dockery was charged, his "fugitive status," and the refusal of his common-law wife, Denise Sutton, to open the door. Id. at 2, 11-12. Despite Tucker's arguments to the contrary, the Court in drafting its Report and Recommendation reviewed the entire record, and considered the totality of information available to Tucker prior to the entry (including Tucker's testimony at Dockery's two criminal trials). The Court will nevertheless address the "totality of facts" cited by Tucker in claiming the protection of qualified immunity with respect to reasonable

belief of presence.

On October 18, 1995, five days prior to the execution of the arrest warrant, the FBI's Washington Field Office forwarded to the FBI's New York Division the Lead, setting forth information relating to plaintiff's suspected whereabouts. [FBI Lead] [#217].[16] The FBI Lead stated that plaintiff "may be located in the *vicinity of* '3 Star Grocery,' 2127 Pitkin Avenue, Brooklyn, New York . . . ." Id. at 1 (emphasis added). The FBI Lead, which refers to a grocery store in a multi-unit building, provides no information supporting a reasonable belief that Dockery would be inside the building at any particular time, let alone that he would be located within a specific apartment.[17] In asking the Court to consider the FBI Lead, Tucker confuses reasonable belief as to *residence* with reasonable belief as to actual *presence*. See, e.g., Lauter, 57 F.3d at 215 (setting out proper inquiry as two-part test: reasonable belief of residence and reasonable belief of presence); Bartlett, 2005 WL 887112, at *6 (giving weight to address listed in probation warrant for reasonable belief of residence).

The severity of the underlying charges listed on Dockery's arrest warrant likewise did not give rise to a reasonable belief of presence. To be sure, obstruction of justice and threatening grand jury witnesses and their families are serious crimes and not to be taken lightly

---

[16] At one point in its R&R, this Court mistakenly stated that the FBI Lead was issued in August 1995. See 9/6/06 R&R [#271] at 46. That error was not material to the Court's conclusions, and all other references correctly characterized the Lead as having been issued on October 18, 1995. See, e.g., id. at 9.

[17] In fact, the FBI Lead's language suggests that it was meant to serve as a starting point for agents to further investigate Dockery's whereabouts, rather than as proof of presence. See [FBI Lead] [#217] at 1 (characterizing its contents as "leads to *conduct* logical fugitive *investigation* to locate and apprehend [Dockery]") (emphasis added).

by this Court; nevertheless, the charges, which arose in D.C., have little bearing on whether plaintiff would be present at the Premises in Brooklyn immediately prior to the October 1995 search.

Regarding the remaining factors – plaintiff's "fugitive status" and Denise Sutton's refusal to open the door – Tucker asks this Court to draw inferences that are not supported by the record. First, while there was an outstanding warrant for Dockery's arrest, the references to him as a "fugitive" establish only that he was being sought in New York on an out-of-state arrest warrant and not that the New York agents believed him to be evading arrest or otherwise concealing his whereabouts. Cf. 7/30/98 Tucker Test. [#281-2] at 701 (explaining that the FBI's Fugitive Task Force was responsible for arresting "people who were wanted on outstanding warrants from other parts of the country that may be located in New York City"). Tucker's belated reliance on the refusal of Dockery's "common[-]law wife" to open the door is similarly unavailing. See Tucker Recons. [#280] at 2. Again, the record contains no undisputed evidence that at the time of the October 1995 search, the agents believed that the woman standing at the window of a multi-unit apartment building had any personal connection to Dockery. Cf. 7/30/98 Tucker Test. [#281-2] at 732 (testifying that Dockery "could have been anywhere in the building since he was the owner").[18] If any inference can be drawn from the record, it is that Tucker did not know the identity of Denise Sutton. See 1/23/97 Tucker Test. [#32] at 222 (testifying that "a young lady who came to the front window, who turned out to be Ms. Sutton"); see also Tucker Decl. [#217] at ¶ 8 (noting that agents saw Dockery

---

[18] As previously noted, Dockery disputes the allegation that he was with the woman later identified as Sutton when agents observed her.

with "a Denise Sutton," without further identifying her in relation to Dockery).

Other common sense factors that courts have identified as creating a reasonable belief of presence include whether the search takes place early in the morning when suspects are typically at home, whether lights and electronics are operating, and whether the suspect is unemployed. See, e.g., Valdez, 172 F.3d at 1226. However, contrary to Tucker's assumption, see Tucker Recons. [#280] at 14, these factors do not advance his argument in this case. The 1995 search did not take place early in the morning, but rather at "about midday." 7/30/98 Tucker Test. [#281-2] at 732. Whether lights or electronics were operating is irrelevant here because the agents observed Denise Sutton through the window and thus knew that the building was at that time occupied by someone. Finally, there is no indication that Tucker was aware of Dockery's employment status.

The Second Circuit cases addressing whether it is reasonable to believe a person is present consider what investigative steps the officers took to determine the person's presence. See, e.g., Lauter, 57 F.3d at 215 (reasonable belief suspect was present when suspect's landlord's son, a reliable confidential informant, told police suspect was unemployed and often slept late); United States v. Manley, 632 F.2d 978, 983-84 (2d Cir. 1980) (suspect was reasonably believed to be present when two neighbors identified him as living at address and one neighbor called FBI agent to confirm suspect had arrived at home); cf. Bartlett, 2005 WL 887112, at *6 (reasonable belief suspect resided and was present at apartment 5-C when superintendent said suspect "possibly" lived in that apartment; suspect's last name was listed on building directory for 5-C; probation warrant listed that address; suspect was previously

arrested there; and agents heard voices within that apartment and received a response of "hold on").[19]  In this case, Tucker and his fellow agents in New York apparently did not conduct any interviews, informal or otherwise, or receive any specific tips relating to Dockery's presence at the apartment before forcibly entering the Premises.[20]

Thus, apart from the agents' disputed sighting of Dockery, the agents had little or no information pointing to Dockery's presence at the Premises mid-day on October 23, 1995. Accordingly, assuming, for purposes of this motion, that Dockery was *not* observed through the window, it was not objectively reasonable for Tucker to enter the Premises when he did, and he is not entitled to summary judgment based on qualified immunity.

### C.  Tucker's Role In The 1995 Entry And Search

Tucker additionally asserts that because he was not the agent in charge at the scene and did not make the ultimate decision to enter, he is protected by qualified immunity.  See Tucker Recons. [#280] at 12.  Tucker's conclusion, however, is undermined by the record.

---

[19]  In Bartlett, where the officers had information concerning a specific apartment, and it was uncontested that the officers heard voices inside that apartment, it was reasonable for the officers to assume the suspect was present.  In contrast, this case involves the entry and search of a multi-unit building and an FBI Lead without a specific apartment number.

[20]  In this regard, it is informative to compare the investigative steps the officers took in arresting Corey Bullock, a member of Dockery's crew, in May 1995, the details of which are set out in a District of Columbia Court of Appeals case.  See Dockery v. United States, 853 A.2d 687 (D.C. 2004).  Police interviewed some of Bullock's neighbors, who indicated that Bullock would be with Dockery.  Id. at 695.  Police then proceeded to interview the manager and employees of Dockery's apartment complex, who confirmed that Bullock was living with Dockery.  Id.  One employee gave police a description of Bullock's car.  Id.  When officials saw a car matching that description parked at Dockery's apartment complex, they executed the warrant.  Id.  Relying on Second Circuit case law, the court found that those investigative steps created a reasonable belief that Bullock was present.  Id.

Contrary to Tucker's contention, even assuming *arguendo* that Tucker was not the case agent in charge, see Tucker 56.1. [#216] at ¶ 15,[21] the record does not establish that the case agent specifically made the decision to enter or that he made it unilaterally. See Tucker Recons. [#280] at 12. In support of his argument, Tucker cites only his sworn statement that "a decision was made to force entry[,]" which is silent as to who made that decision. See, e.g., Tucker Decl. [#217] at ¶ 9; Tucker 56.1 [#216] at ¶ 17. Elsewhere in the record, Tucker testified to his direct involvement in the decision to enter. See, e.g., 7/30/98 Tucker Test. [#281-2] at 708 ("I did personally see [Dockery] in the window, yes. . . . At that point, once he was observed in the window, *we deployed* people around the rear of the building before we actually knocked on the door.") (emphasis added); id. at 732 (testifying that "*[w]e determined*" Dockery's residence prior to executing the arrest) (emphasis added).

In connection with his legal argument, Tucker cites a single case, from the Eleventh Circuit, which held that officers who accompanied a deputy sheriff on a search of a house down the block from the address specified in the warrant were entitled to qualified immunity because "nothing in the record indicate[d] that th[o]se officers acted unreasonably in following [the deputy sheriff's] lead . . . ." Hartsfield v. Lemacks, 50 F.3d 950, 956 (11th Cir. 1995). Tucker argues that, as in Hartsfield, there is no evidence in the record that Tucker had any idea "that Dockery was not present." Tucker Recons. [#280] at 13. Tucker's reliance on Hartsfield is misplaced.

---

[21] Dockery disputes this assertion, citing testimony from Tucker at Dockery's first criminal trial. See Pl. Supp. [#290] at 5; id. Ex. 8 at 238 (Tucker testifies that "I was the case agent," in reference to either the 1995 or 1996 search); 1/23/97 Tucker Test. [#32] at 238.

In Hartfield, it was undisputed that except for the deputy sheriff -- who had procured the warrant -- none of the executing officers had seen the warrant prior to entry or was aware that their supervisor had led them to the wrong address. See Hartsfield, 50 F.3d at 952, 956. Here, in contrast, Tucker's testimony that he observed Dockery through the window is disputed, and the record contains no proof to support Tucker's belatedly advanced theory of mistaken identity. While Tucker assumes the veracity of his testimony, his credibility is an issue for the jury to resolve. Consequently, the Court declines to modify its recommendation that summary judgment be denied with respect to plaintiff's Fourth Amendment challenge to the 1995 entry and search.[22]

### D. Reed And Young's Role In the 1995 Entry And Search

In objecting to the Report and Recommendation, the D.C. defendants again deny that they were present in New York during the 1995 search; they argue that they therefore are entitled to summary judgment on plaintiff's Fourth Amendment and common law tort claims relating to that incident. Specifically, the D.C. defendants complain that the Court relied on inconsistent, implausible hearsay statements proffered by Dockery in reaching its conclusion that a genuine issue of fact exists as to Reed and Young's involvement in the events of October 1995. See D.C. Obj. [#275] at 4, 7-8, 9, 10; D.C. Opp. [#288] at 7 n.6; see also 9/6/06 R&R

---

[22] In a portion of the R&R to which Dockery objects, the Court concluded that Dockery lacked standing to assert the constitutional rights of others, including his children and tenants. See 9/6/06 R&R [#271] at 19-20; Pl. Obj. [#285] at 24-25. Dockery misconstrues the scope of the Court's recommendation, as the opinion expressly notes that the Court was not resolving a separate but related issue left unaddressed by the parties: "whether plaintiff had a reasonable expectation of privacy in portions of the Premises other than his own apartment," including his children's apartment. 9/6/06 R&R [#271] at 20 n.20.

[#271] at 34-35.

As an initial matter, the "hearsay" statements referenced by the D.C. defendants consist of alleged admissions by Reed and Young,[23] which, under the Federal Rules of Evidence, are not even considered hearsay. See Fed. R. Evid. 801(d)(2) (an "[a]dmission by party-opponent" does not constitute hearsay). Moreover, it is not the credibility of the declarants (i.e., Reed and Young) that troubles the D.C. defendants; rather, they attack the credibility of the witness (Dockery) to these alleged admissions. However, the plausibility of Dockery's account is a matter for the jury to resolve at trial, and not for judicial determination on summary judgment. See McClellan v. Smith, 439 F.3d 137, 148-49 (2d Cir. 2006) (holding that the district court should not have adopted one version of the facts in finding defendant's conduct was objectively reasonable); Mickle v. Morin, 297 F.3d 114, 122 (2d Cir. 2002) (reversing district court's determination that police officers' testimony was more credible because the credibility determination belonged to the jury). The Court therefore adheres to its prior recommendation.

**E. Judge Ross' Prior Ruling**

Tucker argues that Judge Ross' earlier entry of summary judgment in Tucker's favor with respect to the February 1996 Fourth Amendment claims "is controlling" and warrants the same result with respect to the claims based on the October 1995 entry and search. See Tucker Recons. [#280] at 15-18. Tucker characterizes the facts surrounding the two incidents as "virtually identical," id. at 16, and faults the Court for "assess[ing] the reasonableness of Agent

---

[23] Reed and Young allegedly told Dockery, after his arrest, that they had been on the Premises during the earlier search. See 9/6/06 R&R [#271] at 34 n.28.

Tucker's conduct [in October 1995] in light of the success of the decision to enter and search the Premises." Id. at 18.  Tucker is mistaken in both respects.

The reasonableness of the agents' conduct must be assessed in light of the information known to them at the time of the challenged conduct; by the time Tucker and his fellow agents entered the Premises in February 1996, they had substantially more knowledge about Dockery than three and a half months earlier.  After the first search, they had reason to believe that, in order to evade apprehension, Dockery had secreted himself in a crawlspace where his wallet and identification had been found.  They also had reason to believe that Denise Sutton, who again declined to open the door in February 1996, was connected to Dockery and had been actively assisting in concealing his whereabouts.  Finally, and most importantly, it is undisputed that on February 6, 1996 -- in contrast to October 23, 1995 -- the agents observed Dockery standing in the doorway of the Premises.  Consequently, in light of these significant factual distinctions, Judge Ross' ruling as to the 1996 entry and search does not compel the same result with respect to the 1995 incident.[24]

III.    **FEBRUARY 1996 FOURTH AMENDMENT CLAIMS:  REED AND YOUNG'S QUALIFIED  IMMUNITY DEFENSE**

Reed and Young ask the Court to consider an additional argument that they failed to

---

[24]  Given the existence of genuine issues of fact as to the legality of the 1995 entry, plaintiff's Fourth Amendment destruction of property claim survives as well, for the reasons discussed in the Report and Recommendation.  See 9/6/06 R&R [#271] at 50-51; cf. Tucker Recons. [#280] at 18-19.

include in their earlier summary judgment motion.[25]  In its 9/6/06 R&R, this Court noted that

although Dockery had opted to pursue his original claims against Reed and Young, relating to

the 1996 entry and search, Reed and Young had not moved for summary judgment on the

claims in his original complaint.  See 9/6/06 R&R [#271] at 4 n.3.  In objecting to the R&R,

the D.C. defendants acknowledged that they had erroneously assumed that Dockery had

abandoned his 1996 claims, and they urged the Court to belatedly hear argument on the motion.

See D.C. Obj. [#275] at 3 n.1; id. at 11-13.  Dockery, who received notice of this request and

had sufficient opportunity to respond, failed to address Reed and Young's new arguments.  For

the reasons set forth below, the Court addresses Reed and Young's supplemental challenge on

the merits, and concludes that they are entitled to summary judgment in connection with the

1996 entry and search.

**A.  Procedural Issues**

In her September 24, 1998 decision granting Tucker summary judgment on the original

complaint ("Orig. Compl. [#2]") based on qualified immunity, Judge Ross declined to enter

summary judgment *sua sponte* as to Reed and Young, who had not made a similar dispositive

motion or supplied the requisite affidavits.  See Dockery, 73 F.Supp.2d at 237-40 & n.13.[26]

---

[25]  Reed and Young originally raised this issue in their objections filed with Judge Ross, who in
turn referred their motion to this Court.  See D.C. Obj. [#275] at 11-15; Order of Judge Ross
dated 12/5/07 [#291].

[26]  Judge Ross explained that because a qualified immunity analysis necessarily involves an
examination of what information the officers possessed at the time of the alleged constitutional
violation, the absence of evidentiary submissions from Reed and Young prevented the Court

(continued...)

Dockery then amended his complaint to address the October 1995 incident, see Amended Complaint ("Am. Compl. [#21]"), and subsequently filed a superseding second amended complaint, which was later superseded by a third amended complaint. See Plaintiff's Proposed Second Amended Complaint ("2d Am. Compl. [#81]"); Third Amended Complaint ("3d Am. Compl. [#154]"). None of the amended complaints specifically addressed the original complaint's 1996 claims against Reed and Young.

On April 28, 2005, in order to clarify the status of the remaining portions of the original complaint, this Court ordered Dockery to notify the Court and defendants by May 10, 2005 whether he intended to pursue the 1996 claims. See 4/28/05 Memorandum and Order [#207] at 15-16. On May 23, 2005, the Court received notice from Dockery dated May 14, 2005 that he was not abandoning his 1996 claims against Reed and Young, and that document was entered into the Electronic Case Filing system that same day. See Notice to Court to Keep Claims Against Reed And Young Active [#221]. Reed and Young's contention that they did not receive notice of Dockery's intention until after the issuance of the Court's 9/6/06 R&R[27] is thus contradicted by the court file, which reflects that all defendants received electronic notice more than a week before the D.C. defendants filed their motion for summary judgment on May 31, 2005. See Memorandum Of Law Of Defendants District Of Columbia, Pamela Reed, Phineas

_____

[26](...continued)
from imputing to them the facts establishing Tucker's qualified immunity. See Dockery, 73 F.Supp.2d at 240 n.13.

[27] See D.C. Obj. [#275] at 3 n.1; id. at 11.

Young, Larry Soulsby And Alan Dreher In Support Of Their Motion To Dismiss Or Alternatively For Summary Judgment ("D.C. Mem. [#227]").

In moving for summary judgment, the D.C. defendants addressed all claims deriving from the 1995 incident, but their motion was silent as to any 1996 claim, see generally D.C. Mem. [#227], thus prompting this Court to leave untouched the remaining portions of the original complaint. See 9/6/06 R&R [#271] at 4 n.3. In their objections filed with Judge Ross, Reed and Young now seek to supplement their summary judgment motion to challenge the original complaint. See D.C. Obj. [#275] at 11-15.

Just as the interests of justice warrant consideration of plaintiff's belated submission,[28] so too here, Reed and Young's supplemental challenge ought to be considered on the merits. Despite the Court's rejection of their claim of lack of notice,[29] the fact remains that consideration of Reed and Young's supplemental argument will not unfairly prejudice Dockery; he had ample opportunity to respond to their submission, but chose not to address the 1996 claims in his subsequently filed papers. See Pl. Obj. [#285]; Pl. Opp. [#289]; Pl. Supp. [#290]; see also Bridgeway Corp. v. Citibank, 201 F.3d 134, 139-40 (2d Cir. 2000) (noting that a party suffers no prejudice from a *sua sponte* entry of summary judgment if it "cannot claim to have been surprised by the district court's action or if, notwithstanding its surprise, the party had no additional evidence to bring"); Scottish Air Int'l Inc. v. British Caledonian Group,

---

[28] See *supra* note 8.

[29] See *supra* p. 26.

PLC, 945 F.2d 53, 55 (2d Cir. 1991) (reversing *sua sponte* entry of summary judgment when losing party had no notice and was not given an opportunity to respond); Hall v. Perilli, 03 Civ. 4635 (RCC) (AJP), 2004 WL 1068045, at *8 n.18 (S.D.N.Y. May 13, 2004) (granting summary judgment for party based on established record even though party did not move for summary judgment).

**B. The Merits**

Reed and Young advance two alternative arguments in support of their motion for summary judgment on the 1996 claims. First, they argue that the undisputed facts in the record show that they were not present at the Premises during the 1996 search, and, as a result, they had no personal involvement with the alleged Fourth Amendment violations. See D.C. Obj. [#275] at 11-13. Second, assuming they were at the Premises during the 1996 search and arrest, Reed and Young contend that they are entitled to the same qualified immunity defense as Tucker, as they "adopt the same position as co-defendant Tucker with respect to the information they possessed and the actions taken." Id. at 13.[30]

As this Court noted in its 9/6/06 R&R [#271] at 31, in order to maintain an action against a federal or state officer or official under *Bivens*[31] or 42 U.S.C. § 1983, a plaintiff must establish specific facts demonstrating that defendant's personal involvement in the constitutional

_____

[30] As Reed and Young's new arguments are contained in their objections filed with Judge Ross, Rule 72(b) of the Federal Rules of Civil Procedure calls for a de novo determination. See Fed. R. Civ. P. 72(b).

[31] See Bivens v. Six Unknown Named Agents Of Federal Bureau Of Narcotics, 403 U.S. 388 (1971).

violations alleged. See McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."); Lonegan v. Hasty, 436 F.Supp.2d 419, 439 (E.D.N.Y. 2006) ("In an action seeking damages for a constitutional deprivation pursuant to Bivens, as in an action pursuant to Section 1983 of the Civil Rights Act, 42 U.S.C. § 1983, . . . personal involvement is a prerequisite to liability."); Grullon v. Reid, No. 97 CIV. 7616(RWS), 1999 WL 436457, at *7 (S.D.N.Y. June 24, 1999).[32]

Giving the record fresh consideration, the Court finds that there is no genuine issue of material fact relating to Reed and Young's participation in the February 1996 entry and search. Reed and Young, in sworn affidavits, declare that they were not present during the 1996 entry and search, that they first came into contact with Dockery at FBI New York headquarters following his arrest, and that their role was limited to post-arrest questioning of Dockery at FBI headquarters. See Affidavit Of Phineas Young In Support Of Motion To Dismiss [#225] ¶¶ 5-6; Affidavit Of Pamela Reed In Support Of Motion To Dismiss [#226] ¶¶ 5-6; see also D.C. Defendants Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 [#224].

_____

[32] A plaintiff may demonstrate the requisite personal involvement either by proof of the defendant's direct participation in the alleged violation, or by that defendant's having acted as a supervisory official who either: (a) failed to remedy the violation once it was reported to him; (b) created a policy or custom that gave rise to the constitutional violation or permitted it to endure; or (c) demonstrated gross negligence in managing the subordinates at whose hands the violation occurred. See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citations omitted); Moffitt v. Town of Brookfield, 950 F.2d 880, 886 (2d Cir. 1991) (quoting Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)). As nothing in the record suggests that Reed and Young have been named as supervisory officials, the Court has reviewed the record for evidence of their participation in the conduct complained of.

Conversely, Dockery has offered no evidence contradicting this assertion, nor is the Court otherwise aware of such evidence. See generally Plaintiff's Response To Statement Of Material Facts As To Which DC Defendants Contend There Is No Genuine Issue And/Or Undisputed Facts [#265].[33] Accordingly, because there is no disputed fact as to Reed and Young's lack of participation in the alleged 1996 Fourth Amendment violations, they are entitled to summary judgment on those claims.

In any event, even assuming *arguendo* that Reed and Young were present at the Premises on February 6, 1996, their affidavits warrant the imputation to them of the information possessed by Tucker at the scene, which Judge Ross concluded gave rise to a reasonable belief that exigent circumstances existed. See Dockery, 73 F.Supp.2d at 239. Nothing in the record supports a finding that Reed and Young possessed any additional or different information so as to distinguish their situation from that of Tucker. Therefore, Reed and Young are entitled to qualified immunity on the 1996 Fourth Amendment claims, and this Court recommends that summary judgment be granted in their favor, dismissing the remaining portions of the original complaint.

## IV. DUE PROCESS CLAIMS

Dockery objects to this Court's recommendation that the defense motions for summary judgment be granted with respect to his due process claims. See Pl. Obj. [#285] at 25-26;

---

[33] In contrast, with respect to the 1995 search, Dockery provided an affidavit attesting to a conversation in which Reed and Young allegedly admitted their presence. See 9/6/06 R&R [#271] at 34-35 & n.28.

9/6/06 R&R [#271] at 23-30. As an initial matter, Dockery's memorandum of law does nothing to clarify whether the alleged violations involved procedural or substantive due process: although his argument carries the heading "Procedural Due [P]rocess" (Pl. Obj. [#285] at 25), he relies on cases concerning substantive due process. See id. at 26-27 n.4.

More importantly, Dockery now contends that the "property" improperly taken from him was his daughter Tiara Bullock ("Tiara"). See id. at 26. However, Dockery's due process allegations concerning Tiara are no longer in the case, and have not been in the case since 2003; at that time, Judge Ross adopted this Court's Report and Recommendation dated March 26, 2003 ("3/26/03 R&R [#148]"), and granted Dockery permission to amend his complaint in certain respects but denied him permission to allege, among other things, that Tiara's removal violated Dockery's right to due process. See Opinion and Order dated June 18, 2003 ("6/18/03 O&O [#152]"); 3/26/03 R&R [#148] at 8-11. Dockery cannot resurrect that flawed theory at this late date. Nor has he articulated any basis for rejecting the recommendations contained in the Court's most recent Report and Recommendation concerning other potential bases for his due process claims.[34]

## V.      COMMON LAW TORT CLAIMS

Plaintiff moves this Court to reconsider its recommendation that plaintiff's common law tort claims against defendant Tucker be dismissed for lack of subject matter jurisdiction on the ground that the Federal Torts Claim Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2401(b), 2671-

---

[34] Dockery also alleges that "it was never his intention to abandon any claims made against Reed and Young . . . ." Pl. Obj. [#285] at 26. This Court has not suggested otherwise. See *supra* p. 26.

2680, required plaintiff to sue the United States, not Tucker.[35]  Specifically, plaintiff objects to

the Court's further conclusion that any tort claims against the United States must fail because

plaintiff did not exhaust the necessary administrative remedies under the FTCA.  Plaintiff

requests that the Court re-examine his tort claims in light of an FTCA tolling provision, which

this Court previously declined to consider as neither party had briefed the issue.  See Pl. Obj.

[#285] at 27-28; 9/6/06 R&R [#271] at 18-19 n.17.  In response to plaintiff's application,

Tucker contends that the tolling provision does not apply here and that, in any event, plaintiff's

tort claims are unexhausted and thus subject to dismissal.  See Tucker Opp. [#287] at 2, 5-10.

For the reasons set forth below, the Court adheres to its recommendation that plaintiff's tort

claims against Tucker and/or the United States be dismissed.

## A.  The FTCA

The FTCA allows individuals to bring an action against the United States when federal

employees commit certain common law torts in the course of their official duties.  See 28

U.S.C. § 1346(b)(1); Osborn v. Haley, 127 S.Ct. 881, 887 (2007); Celestine v. Mt. Vernon

Neighborhood Health Ctr., 403 F.3d 76, 80 (2d Cir. 2005).  An FTCA suit against the United

States is the exclusive remedy for such torts; federal employees enjoy absolute immunity.  See

28 U.S.C. § 2679(b)(1); Celestine, 403 F.3d at 80 (noting that one of the FTCA's purposes is

"to immunize such employees and agents from liability for negligent or wrongful acts done in

the scope of their employment").

---

[35]  As previously noted, Dockery's claims appear to be brought under three possible theories of
tort liability: conversion, trespass to chattels and/or trespass to lands.  See 9/6/06 R&R [#271]
at 14 n.13.

A party may not file suit against the United States under the FTCA "unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing . . . ." 28 U.S.C. § 2675(a); see also 28 U.S.C. § 2401(b) ("A tort claim against the United States shall forever be barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues . . . ."). "This requirement is jurisdictional and cannot be waived." Celestine, 403 F.3d at 82.

In 1988, Congress amended the FTCA with the passage of the Federal Employees Liability Reform and Tort Compensation Act of 1988 ("the Westfall Act"), Pub. L. 100-694, 102 Stat. 4563 (1988); see Osborn, 127 S.Ct. at 887. The Westfall Act, *inter alia*, tolls the administrative exhaustion requirement in cases where a plaintiff initially brings suit against a federal employee,[36] the United States is later substituted as the proper defendant after the employee has been certified to be acting within the scope of his or her employment,[37] and the

---

[36]  In its 9/6/06 R&R, this Court questioned whether section 2679(d)(5)'s tolling provision applies to non-removal cases, as some courts interpreting the provision seemed to limit it to removal cases.  9/6/06 R&R [#271] at 18-19 n.17; see, e.g., Celestine, 403 F.3d at 83 (noting that when a plaintiff's case is removed, the Westfall Act gives plaintiff the opportunity to exhaust administrative remedies); Pudney v. Otselic Valley Family Health, N.P., P.C., No.5:-04-CV-760, 2004 WL 2634305, at *3 (N.D.N.Y. Nov. 3, 2004) (noting that section 2679(d)(5) "protect[s] plaintiffs who initiated suit in state court without realizing that the defendant was a federal entity") (citations omitted); see also Pub. L. 100-694, 102 Stat. 4563 (1988) (labeling section 2679(d) as "Representation and Removal").  An intervening Supreme Court decision examining section 2679(d) makes it clear that the tolling provision applies whether the action is originally brought in state or federal court.  See Osborn, 127 S.Ct. at 887-88.

[37]  The Westfall Act contemplates three situations in which the United States may be substituted as a defendant:  when (1) the United States Attorney General certifies in a federal action that the alleged tort occurred within the scope of employment; (2) the Attorney General certifies in a state action that the alleged tort occurred within the scope of employment; or (3) the defendant employee petitions the Court to certify in the event Attorney General refuses

(continued...)

claim is subsequently dismissed because the plaintiff failed to exhaust the required

administrative remedies.  See 28 U.S.C. § 2679(d).  Once the case is dismissed under those

circumstances, a plaintiff may file a new FTCA action if and only if (1) the claim would have

been timely had it been filed pursuant to the original action; and (2) the claim is presented to the

appropriate federal agency within sixty days of the original action's dismissal.  See 28 U.S.C. §

2679(d)(5).[38]  Thus, section 2679(d) of the FTCA creates a sixty-day statute of limitations grace

period where there has been certification, substitution, and dismissal for failure to exhaust

administrative remedies.

### B.  Tucker's Federal Employment Status

Dockery argues that the tolling provision of section 2679(d)(5) should apply because

"not until long after filing [this] lawsuit" did he become aware that Tucker was a "federal

employee, [and that his] acts were occurred [sic] within the scope of [his] employment . . . ."

See Pl. Obj. [#285] at 28.  He thus asks that the Court "continue the case pending exhaustion"

_____

[37](…continued)
 certification. See 28 U.S.C. § 2679(d)(1)-(3).

[38]  Section 2679(d)(5) provides that:

> Whenever an action or proceeding in which the United States is substituted as
> the party defendant under this subsection is dismissed for failure first to present a claim
> pursuant to section 2675(a) of this title, such a claim shall be deemed timely presented
> under section 2401(b) of this title if –
>> (A) the claim would have been timely had it been filed on the date
>> the underlying civil action was commenced, and
>> (B) the claim is presented to the appropriate Federal agency
>> within 60 days after dismissal of the civil action.

28 U.S.C. § 2679(d)(5).

of his administrative remedies.  Id.

Many courts interpreting section 2679(d)(5) have emphasized that Congress intended to grant relief to plaintiffs who were unaware of the defendants' federal status.  See, e.g., Mittleman v. United States, 104 F.3d 410, 412 (D.C. Cir. 1997) (reading section 2679(d)(5) to grant relief to plaintiffs who mistakenly suppose that their claim lies with the employee individually); Norman v. United States, 377 F.Supp.2d 96, 98, 99 (D.D.C. 2005), aff'd, 467 F.3d 773 (D.C. Cir. 2006) (applying section 2679(d)(5) where defendant's federal employment status was revealed a few months after plaintiff filed suit and noting that Congress passed the Westfall Act to "provide some relief where the United States is *unexpectedly* substituted as a party defendant") (emphasis added); Albright v. Keystone Rural Health Ctr., 320 F.Supp.2d 286, 290 (M.D. Pa. 2004) ("Thus, the Westfall Act creates in effect a legislative grace period when the United States is substituted as the party defendant for an entity or employee that a plaintiff is not aware has federal status at the time of the suit."); Nin v. Liao, No. 02 Civ. 8308 (JCF), 2003 WL 21018816, at *4 (S.D.N.Y. May 5, 2003) (noting that section 2679(d)(5) protects plaintiffs who initiated suit in state court without realizing that the defendant was a federal entity); Bryant v. United States, 96 F.Supp.2d 552, 554 (N.D. Miss. 2000) ("Section 2679(d)(5) provides protection for the plaintiff who has no knowledge of the federal presence in a case[.]").

Dockery's claim that he was unaware of Tucker's federal status is belied by the record. First, when Dockery initially filed his complaint in 1997, he identified Tucker as an FBI agent. Orig. Compl. [#2] at 1.  Furthermore, later that year, when Dockery first amended his pleading

to add allegations concerning the 1995 search, he expressly asserted that defendant Tucker was at all material times "working as a [s]pecial agent FBI, New [Y]ork acting under the color of FEDERAL LAWS . . . ." Am. Compl. [#21] at ¶ 1; see id. at ¶ 3. In ruling on Tucker's initial motion to dismiss, Judge Ross expressly noted in her 1998 opinion that Tucker "operate[d] under color of federal law" and that the FTCA "only creates remedies against the United States, not its agents or employees." Dockery, 73 F.Supp.2d at 228 n.1.

Thereafter, on November 12, 1998, in his Answer to Amended Complaint ("Ans. Am. [#52]"), Tucker expressly admitted that "Nathan Tucker was an employee of the Federal Bureau of Investigation and was acting within the scope of his office and employment during the time period relevant to the complaint." Ans. Am. [#52] at ¶ 1; see id. at ¶ 3. Tucker so testified at Dockery's criminal proceedings. See generally 7/30/98 Tucker Test. [#281-2] at 701-02; 1/23/97 Tucker Test. [#32] at 219-20. Moreover, at the heart of Dockery's civil litigation over the last ten years is a *Bivens* claim -- an implied right of action available against individual federal employees who allegedly violate constitutional rights. See Bivens, 403 U.S. 388; see also 3d Am. Compl. [#154] at 2, 11-16. For Dockery to argue, at this point, that he was unaware of Tucker's status as a federal employee is, to put it mildly, totally frivolous.

That said, it remains unclear whether Congress intended section 2679(d) to apply only when the defendant's federal status is unknown. Certainly, that interpretation aligns with Congress' interest in preventing plaintiffs from presenting the United States with stale tort claims. See, e.g., Long v. Card, 882 F.Supp. 1285, 1288 (E.D.N.Y. 1995) (noting that Congress enacted FTCA with a strict statute of limitations to prevent "assertion of stale

claims"); <u>Mendez v. United States</u>, 732 F.Supp. 414, 428 (S.D.N.Y. 1990) (noting that the FTCA's underlying policy is to "relieve the government of the ever[-]present threat of stale claims"). Otherwise, plaintiffs could delay the entire process by intentionally suing only the federal employee and waiting for the United States' motion to certify and dismiss, only to thereafter refile against the United States within sixty days of the dismissal.

Nevertheless, nothing in the language of section 2679(d)(5) limits its application to instances in which an employee's federal status is unknown.[39] Similarly, the Westfall Act's legislative history does not confine the protections of section 2679(d) to plaintiffs who are ignorant of the defendants' federal status. <u>See</u> H.R. Rep. No. 100-700, at 9 (1988). Accordingly, this Court will re-examine Dockery's common law tort claims in light of section 2679(d)(5).

**C. Application of Section 2679(d)(5**)

To trigger the running of the sixty-day grace period under section 2679(d)(5), three conditions must be satisfied: certification that the individual defendant acted within the scope of employment; substitution of the United States as defendant; and dismissal for failure to exhaust administrative remedies. <u>See</u> 28 U.S.C. § 2679(d)(5). As discussed below, this Court concludes that Judge Ross' ruling on plaintiff's July 26, 1999 attempt to further amend his complaint to add a tort claim against the FBI sufficiently satisfied these conditions to initiate the sixty-day grace period. <u>Cf</u>. <u>Faura Cirino v. United States</u>, 210 F.Supp.2d 46, 53 (D.P.R. 2002) (finding that plaintiffs adequately complied with the spirit of section 2679(d)(5)).

---

[39] <u>See</u> *supra* note 38.

On July 26, 1999, Dockery submitted his proposed second amended complaint, wherein he alleged a tort claim against the FBI relating to the 1995 search and seizure. See 2d Am. Compl. [#81] at 9-12. Counsel for Tucker objected to this proposed amendment because Dockery had failed to exhaust his administrative remedies, and thus any claim against the FBI and/or United States would be subject to dismissal. See 8/16/99 Letter from AUSA Gail Matthews Responding To Plaintiff's Proposed Second Amended Complaint ("Tucker Obj. to 2d Am. Compl. [#251]") at 3. In its March 26, 2003 Report and Recommendation, this Court construed the proposed amendment as one against the United States under the FTCA,[40] and concluded that an FTCA amendment against the United States would be futile as Dockery had failed to exhaust the required administrative remedies. See 3/26/03 R&R [#148] at 15-16. Judge Ross adopted the Court's recommendation and denied the amendment. See 6/18/03 O&O [#152].

Although the United States Attorney General has never formally moved to certify Tucker as acting within the scope of his employment in connection with the 1995 search, "the statute permits the court to certify," B&A Marine Co. v. Am. Foreign Shipping Co., 23 F.3d 709, 715 (2d Cir. 1994), and "substantial compliance" with the certification requirement suffices to invoke the FTCA's statutory immunity. See Taber v. Maine, 67 F.3d 1029, 1053-54 (2d Cir. 1995) (noting in dictum that government employee's affidavit could be construed as

---

[40] Tellingly, Dockery's proposed second amended complaint acknowledged that the United States was the proper defendant under the FTCA. See 2d Am. Compl. [#81] at 7 ("In addition, under the Tort Claims Act[,] the United States is liable [o]nly where the employee who causes the injury is acting within the scope of his office or employment.").

petition for certification); B&A Marine, 23 F.3d at 715 n.4 (noting that brief filed by agent of the government and agent's employee would serve as certification petition); Nwaokocha v. Sadowski, 369 F.Supp.2d 362, 376 (E.D.N.Y. 2005) (construing United States' request to be substituted as defendant as equivalent to certification); Point-Dujour v. United States Postal Serv., No. 02 Civ. 6840 (JCF), 2003 WL 1745290, at *3 n.5 (S.D.N.Y. Mar. 31, 2003) (noting that because scope of employment was undisputed, the United States was proper defendant).

Since the commencement of this lawsuit against Tucker in 1997, neither party has disputed that Tucker conducted the 1995 search as part of his official duties as an FBI agent. Indeed, the government expressly admitted that fact in November 1998, in answering plaintiff's amended complaint. See Ans. Am. [#52] at ¶¶ 1, 3. To the extent that Dockery was nevertheless unaware of his obligation to exhaust his administrative remedies under the FTCA, his ignorance ended in 1999, when the defense opposed the addition of tort claims against the FBI, based on Dockery's failure to exhaust. See Tucker Obj. to 2d Am. Compl. [#251] at 3.[41]

As certification was then sufficiently complied with for purposes of section 2679(d)(5), this Court recommended substituting the United States as a defendant and then sustaining Tucker's objections to the proposed FTCA claims. See 3/26/03 R&R [#148] at 15-16. Specifically, the Court concluded that any such claim would be futile because Dockery had failed to exhaust his administrative remedies. Id. at 15; see Foman v. Davis, 371 U.S. 178,

---

[41] In any event, ignorance of the exhaustion requirement does not excuse the filing of a timely administrative claim, even where, as here, the plaintiff is proceeding *pro se*. See Fuentes v. Parks, No. 03 Civ. 2660(RMB), 2005 WL 911442, at *2-3 (S.D.N.Y. Apr. 18, 2005).

182 (1962) (court may refuse to allow a plaintiff to amend a complaint if the claim would be futile). When Judge Ross adopted this Court's conclusion, her ruling was the functional equivalent of a dismissal of Dockery's FTCA claim, inasmuch as the standard for denying an amendment based on futility is substantially the same as the standard governing a motion to dismiss. See, e.g., Journal Publ'g Co. v. Am. Home Assurance Co., 771 F. Supp. 632, 635 (S.D.N.Y. 1991).[42]

Accordingly, Dockery's sixty-day grace period for filing an administrative complaint under section 2679(d)(5) began no later than June 18, 2003, when Judge Ross adopted the earlier R&R, see 6/18/03 O&O [#152], and it ended on August 18, 2003. Because that deadline expired more than four years ago, Dockery's FTCA claim against Tucker is untimely and should be dismissed.[43]

---

[42] An amendment is futile if it could not survive a motion to dismiss. See Hill v. Gristede's Operating Corp., No. 06 Civ. 10197 (LTS)(HBP), 2007 WL 1771549, at *1 (S.D.N.Y. June 18, 2007) (collecting cases); James v. United States, No. 99 Civ. 4238 (BSJ)(HBP), 2003 WL 22149524, at *3 (S.D.N.Y. Sept. 17, 2003). For that reason, courts have analyzed objections to allegedly futile proposed amendments as motions to dismiss. See Journal Publ'g, 771 F. Supp. at 635 ("The Proposed Amended Complaint may therefore be scrutinized as if defendants' objections to the amendments constituted a motion to dismiss under Fed.R.Civ.P. 12(b)(6)."); Hannah v. Metro-North Commuter R.R. Co., 753 F.Supp. 1169, 1176 (S.D.N.Y. 1990) (scrutinizing defendant's objections to plaintiff's proposed second amended complaint as a motion to dismiss); accord Hill, 2007 WL 1771549, at *1.

[43] That the proposed second amended complaint asserted tort claims against the FBI, as opposed to Tucker individually, does not alter this conclusion. In either event, the only proper defendant under the FTCA is the United States, and Dockery has been on notice since at least 2003 that he could not assert an FTCA claim without exhausting his administrative remedies. To allow him now to invoke the Westfall Act based on his addition of tort claims against Tucker would lead to an absurd result: any litigant who failed to take advantage of the grace period after dismissal of a tort claim against a federal employee or agency would then be able to refile the claim against a different federal employee and thereby obtain a second grace period. Congress surely did not contemplate that section 2679(d)(5) would grant plaintiffs two or more grace periods in connection with the same administrative claim.

## VI.    *MONELL* CLAIM

Dockery challenges this Court's recommendation that summary judgment be granted dismissing his *Monell* claim against the District. See Pl. Obj. [#285] at 23-24; 9/6/06 R&R [#271] at 54-57. Dockery complains that he was deprived of the discovery needed to sustain his *Monell* claim. See Pl. Obj. [#285] at 23-24; Pl. Supp. [#290] at 10. However, as the Court explained in its R&R, the D.C. defendants did in fact provide *Monell* disclosure despite an earlier order bifurcating discovery on the *Monell* claim. See 9/6/06 R&R [#271] at 55 n.53. Therefore, the Court declines to modify its recommendation.

## CONCLUSION

For the foregoing reasons, this Court adheres to the recommendations contained in its 9/6/06 Report and Recommendation except that, in response to Reed and Young's supplemental motion, the Court recommends that summary judgment be granted in their favor with respect to the claims arising out of the 1996 entry and search.

Any objections to the recommendations contained in this Report and Recommendation must be filed with the Honorable Allyne R. Ross on or before December 26, 2007. Failure to file objections in a timely manner may waive a right to appeal the District Court order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a ), 6(e), 72; Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

**SO ORDERED.**

Dated:    **Brooklyn, New York**
          **December 5, 2007**

                              **ROANNE L. MANN**
                              **UNITED STATES MAGISTRATE JUDGE**